**Opinion issued August 27, 2013**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00839-CR

———————————

**LITREY DEMOND TURNER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Case No. 07CR0760**

---

## O P I N I O N

A jury convicted appellant Litrey Demond Turner of capital murder, and in accordance with the mandatory sentencing statute that was in effect at the time of sentencing, the trial court sentenced him to life in prison without the possibility of

parole.[1]  In three issues, Turner challenges his sentence arguing that because he was only 15 years old at the time of the offense, his sentence is unconstitutional. In two additional issues, he challenges the legal sufficiency of the evidence to support a conviction for either capital murder or murder, arguing that there is no evidence that he intended to kill the complainant.

Although the evidence is legally sufficient to support his conviction, Turner's sentence is unconstitutional.  *See Miller v. Alabama*, 132 S. Ct. 2455, 2464 (2012).  Accordingly, we reverse the sentence and remand this case for a new sentencing hearing.

## Background

In early August 2006, when he was 15 years old, Litrey Turner moved in with his aunt, Donna Morris, at the Northern Pines apartment complex in Dickinson, Texas.  According to Morris, Turner began spending time with Andrew Brown, a teenager who wore dreadlocks and who also lived at the apartment complex.  Brown sometimes went by the street name "Young Money."

On August 21, 2006, Kathy Porter, who cared for her grandchildren at Northern Pines, saw a group of four or five teenage boys standing outside in the courtyard, including Brown, whom she recognized by his dreadlocks.  She saw

---

[1]  *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(2), 29.02(a)(1), 31.03 (West 2011 & Supp. 2012); Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 1, sec. 12.31, 2005 Tex. Gen. Laws 2705 (former version of TEX. PENAL CODE ANN. § 12.31), *amended by* Act of July 11, 2013, 83rd Leg. 2d C.S., ch. 2 (S.B. 2).

Brown pass around a small black handgun and hand it to another boy who was several inches taller. She did not know whether Turner was among the boys in the courtyard that day.

That afternoon, Turner and Brown went to a nearby convenience store called "Storekeepers." Storekeepers was less than a block away from Northern Pines. The complainant Phoung Lam worked the afternoon-to-night shift, until closing time around 11:00 p.m. The store's surveillance video from the afternoon of August 21, 2006, showed Turner purchasing a drink or snack while Brown danced in the aisle near the counter. The black-and-white video showed that Turner was several inches taller than Brown and that both were dressed in dark clothing.

Sheryl Mitchell also lived at Northern Pines. She testified that Brown, Turner, and Alexis Moore were at her apartment in the afternoon or evening of August 21, when Brown showed his gun to Alexis and talked about his intention to rob someone. Although Mitchell testified that Turner was present for this conversation, Alexis, who is Turner's cousin and who admitted to several prior convictions, denied being at Mitchell's apartment with Brown and Turner.[2]

Michael Davis was a cousin of siblings Brittney and Alexis Moore, who lived at Northern Pines. On August 21, 2006, Davis visited his cousins at the

---

[2]  Alexis said that Brown once showed her a gun that he had in his waistband, but Turner was not there and that this happened near Brown's apartment while she was waiting to make a drug deal.

3

apartment complex. Around 9:00 or 9:30 p.m., he walked to Storekeepers. He saw Brown and Turner standing by the convenience store's dumpster at approximately 9:30 p.m. He noticed them breaking off pieces of boards from the fence around the dumpster, and he thought it looked suspicious.

Brittney Moore and Trikeith Sanders also went to Storekeepers that night. They testified that they saw Turner and Brown outside the convenience store around 10:00 p.m. and that Brown asked if a car parked in front of the store was an unmarked police car. They both said that when Brown asked the question, Turner was standing with him. Turner was wearing a black shirt and black pants at the time. None of these witnesses—Michael Davis, Brittney Moore, or Trikeith Sanders remained at Storekeepers—instead they left to return to the apartment complex or to run other errands.

The Storekeepers surveillance video shows what happened at approximately 11:00 p.m. Phuong Lam walked in front of the counter to lock up the store. As she put the key in the lock, the door opened from the outside, and she struggled to close the door but was pulled outside. She returned inside and again struggled to close and lock the door. An assailant briefly came slightly past the door frame, into the store. Lam fell to the floor.

Around 11:00 p.m., Brittney Moore and Trikeith Sanders were again walking past the convenience store when Brittney noticed Lam's car was still

4

outside. This struck her as odd because "she's never there that late." Brittney walked to the door and heard Lam sobbing. Both she and Sanders saw Lam lying by the door in a pool of blood.

Just then, Davis came upon them as he was again walking in the direction of the store. They told him that Lam was dead. Davis walked back to the store with them, and he saw Lam lying in a pool of blood, barely breathing, and moaning. Davis called 9-1-1 and requested assistance. He and Sanders then heard Brown calling out from behind the dumpster.

Police responded within minutes, and Lam, who still had a faint pulse, was transported to an emergency room where she later died. Shortly after the incident, the police received an anonymous tip that they should "check out Young Money from New Orleans at Northern Pines." Sgt. J. Jaekel, a patrol supervisor with the City of Dickinson Police Department, spoke with the three witnesses who encountered Lam shortly after the attack. He decided that investigators should go to Northern Pines to search for the suspect. While Sgt. Jaekel was coordinating efforts, Deputy J. Gillane of the Galveston County Sherriff's Department went to the apartment complex, where he saw two young men. Deputy Gillane testified that they appeared extremely nervous and kept looking back toward the police car. He watched them go into an apartment. Almost immediately, he saw one of them leave and go into a different apartment.

5

Casey Walker, another Northern Pines resident, testified that Brown and Turner approached him that night and asked if they could go into his apartment. He declined, they left, and he watched them go to Mitchell's apartment. He did not see either of them leave before the police arrived and arrested them.

Both Mitchell and her then-boyfriend, Yancy McDow, testified that Brown and Turner came to her apartment a little after 11:00 p.m. McDow said Turner was "nervous," "couldn't sit still," "was tapping his feet on the floor," and "would get out of his seat and would look out of the blinds." Brown, however, was calm. Turner left after less than five minutes and went to his aunt's apartment.

Morris said that sometime after 11:30 p.m. both Turner and Brown came from the back of her apartment to the front, implying that they had entered the apartment through the rear bedroom window, which they often left open and sometimes used for passing groceries or laundry into the house. Morris testified that as Brown left, he instructed Turner to keep quiet.

Sgt. Jaekel arrived at Northern Pines after Turner left Mitchell's apartment. Deputy Gillane showed him which apartments Brown and Turner had entered. A few minutes after Turner left Mitchell's apartment, Sgt. Jaekel arrested Brown there. He then went to Morris's apartment.

Turner's mother, Brenda, was at Morris's apartment on the night of the shooting. Brenda said that she did not see Brown in Morris's apartment that night. Brenda thought her son was in the back bedroom all night.

Sgt. Jaekel asked Turner where he had been that night. Turner said he and Brown had been together at his apartment all night. Sgt. Jaekel then confronted Turner with the information that Brown had already been found in another apartment. He arrested Turner for making a false report and placed him in a sheriff's patrol car.

Police then obtained consent to search Mitchell's, Brown's, and Morris's apartments. In Mitchell's apartment, police found no evidence pertaining to the charged offense. In Brown's apartment, police found: (1) a live .38-caliber cartridge in Brown's closet, (2) a second cartridge in a shoe box near the closet, (3) two framed photographs hanging on the wall—one showing Brown holding what appeared to be a .38-caliber revolver and marijuana and the other showing Brown holding a shotgun and "quite a bit of what appears to be cocaine and possibly marijuana." They did not find a gun.

In Turner's bedroom in Morris's apartment, police found a black shirt and black pants, as well as a black purse containing Lam's social security card. The clothing matched the description of what Turner had worn that night. The purse

had been hidden behind the bed and covered with a pillow. Police did not find a gun in Turner's bedroom.

J. Rojas, a forensic chemist with the Texas Department of Public Safety's crime laboratory, tested the black pants that were found in Turner's room. Rojas found one particle on the pants that was indicative of gunshot residue, and he explained that his findings could mean that the person who wore the pants fired the gun, handled the gun, or was near a gun when it was fired. He also testified that other items, like fireworks or brake lights, could produce similar particles.

C. Story, a forensic scientist with the Texas Department of Public Safety Crime Laboratory, analyzed the bullet recovered from Lam and compared it to the cartridge found in Brown's closet and the photographs taken from his apartment. Story testified that the bullet that he tested could have been fired from the handgun shown in the photograph with Brown.

Turner was taken to the police station. Because he was under the age of 18, a justice of the peace came to the police station and advised him of his legal rights. Turner then gave a statement to the police in the form of an interview. Initially, he said that he and Brown watched a movie at his house that night and later walked to Storekeepers shortly before 11:00 p.m. with Brown's father. Turner told the police that he did not know Brown was armed at that time or that he intended to rob the

8

convenience store. Turner did, however, state that he had previously seen Brown with a gun, which Brown hid behind some steps at the apartment complex.

During the interview, Turner repeatedly denied any involvement in the robbery and murder, and he initially denied any knowledge of it. He repeatedly said, "I didn't do it." He told the detective that he was going to the store with Brown to get snacks. Turner said that he first saw the gun when Brown showed it to Lam during the robbery. Turner said that he stayed near the dumpster because he wanted to return home. As Lam was locking up the store, he saw Brown point a gun at her, demand her purse, and then shoot her. Turner said he ran home, took a bath, and changed his clothes. He also said that he normally kept his ground-floor bedroom window open and that Brown climbed in the window and stashed Lam's purse in his room.

The day after Turner's arrest, Morris found a black coin purse in a basket in Turner's bedroom. She looked inside and found Lam's driver's license. She also found a ski mask, a bandana, and a ball cap in Turner's bedroom, none of which, she said, belonged to Turner. Morris gave these things to the police. Forensic analysis showed that Turner's DNA was found on the black coin purse, but Brown's was not. Brown's DNA was found on the knit cap, but Turner's was not.

That same day Brown's parents came to Morris's apartment. Morris said they searched around and went into her daughters' bedroom, ostensibly looking for

9

the gun used in the robbery. Morris's niece, Saqouia Turner, had stayed overnight and, when Brown's parents arrived she was sleeping in the bedroom that Turner had used. Brown's father searched the room where Saqouia slept; meanwhile his mother kept Morris occupied in conversation in the living room. When Morris recalled her niece was sleeping in the back bedroom, she went to the bedroom and found Brown's father searching in a laundry basket. As Brown's mother moved to lift the cover on the bin where Turner stored his clothes, Brown's father said, "no," and informed her that he had already looked in that bin. After Brown's parents left, Morris and Saqouia opened the bin, and they found a black gun and a cell phone. Saqouia said that it was a black revolver which "had four bullets and one was missing." and that it was lying atop a shirt. Morris said when Saqouia opened the trunk the gun fell to the bottom. Both Morris and Saqouia testified that they believed Brown's parents put the gun in the room when they came over, but Saqouia conceded that she did not actually know how the gun got there. Acting on the belief that Brown's parents were trying to frame her brother, Saqouia wrapped up the gun, placed it in a black garbage bag, and threw it in or near the apartment complex dumpster. Morris eventually told the police what Saqouia had done. The police, along with Saquoia, searched for the gun, but they did not find it.

Turner was charged with capital murder. He pleaded not guilty, and his case was tried to a jury. The court's charge included capital murder and the lesser-

included offenses of murder, aggravated robbery, and robbery. It also instructed the jury on the law of parties. The jury found Turner guilty of capital murder. In accordance with the statute in effect at the time of this offense, the court imposed the mandatory statutory sentence of life imprisonment without parole. *See* Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 1, sec. 12.31, 2005 Tex. Gen. Laws 2705 (amended 2013) (former TEX. PENAL CODE § 12.31). Turner appealed.

<b>Analysis</b>

**I.     Sufficiency of the evidence of capital murder**

In his fourth issue, Turner challenges the legal sufficiency of the evidence to support his conviction for capital murder, arguing that he did not intend to cause Lam's death during the robbery and that the law of parties does not apply in this case.

We review the legal sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). The standard is the same for both direct and circumstantial evidence cases. *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995). The trier of fact is the sole judge of the weight and credibility of the evidence. *See Lancon v. State*, 253 S.W.3d 699, 707

11

(Tex. Crim. App. 2008). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this was the function of the trier of fact. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

Turner argues that applying the law of parties to capital murder effectively eliminates the mens rea element of capital murder, which the State must prove. First, Turner argues that section 19.03 of the Texas Penal Code, which sets forth the elements of capital murder, incorporates section 19.02(b)(1), which establishes the mens rea for murder, "A person commits an offense if he . . . intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03 (West 2011 & Supp. 2012). Turner argues that the evidence against him is insufficient because there is no evidence that he intended to kill Lam. Second, Turner argues that the evidence is also insufficient under the law of parties because there is no evidence that he had the intent to commit robbery and to kill Lam.

Section 7.02 of the Texas Penal Code provides that:

> (a) A person is criminally responsible for an offense committed by the conduct of another if:
>
> > (1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;

12

(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or

(3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.

(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PEN. CODE ANN. § 7.02 (West 2011). Under section 7.02(b) the intent to participate in a conspiracy to commit an underlying felony supplies the mens rea for another felony actually committed in furtherance of the unlawful purpose. *See id.* The Court of Criminal Appeals has long held that the law of parties applies to capital murder. *See Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App.) ("A person can be convicted of capital murder as a party to the offense, without having had the intent to commit the murder."), *cert. denied*, 131 S. Ct. 3073 (2011); *Valle v. State*, 109 S.W.3d 500, 503–04 (Tex. Crim. App. 2003) ("A defendant may be convicted of capital murder under § 7.02(b) without having the intent or actual anticipation that a human life would be taken."); *Johnson v. State*, 853 S.W.2d 527, 535 (Tex. Crim. App. 1992) (holding that an individual may be

13

found guilty of capital murder based on the law of parties); *see also Cienfuegos v. State*, 113 S.W.3d 481, 493 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

Because the issue is well-settled, we reject Turner's arguments that the law of parties does not apply to his case and that the evidence is legally insufficient because there is no evidence that he intended to kill Lam. In addition, the evidence is legally sufficient to support Turner's conviction of capital murder under the law of parties. Under the law of parties, if Turner conspired with Brown to rob the store, Turner could be held criminally liable for capital murder committed by Brown. A person commits robbery if, while unlawfully appropriating property with the intent to deprive the owner of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *See* TEX. PENAL CODE ANN. § 29.02 (West 2011). A person commits the offense of capital murder if he intentionally or knowingly causes the death of an individual while in the course of committing or attempting to commit certain delineated felonies, including robbery. *See id.* § 19.02(b)(1) (West 2011), § 19.03(a)(2) (West Supp. 2012). Thus, if Brown committed the murder in an attempt to carry out the conspiracy to commit robbery and if Turner should have anticipated his actions, he can be held criminally responsible even in the absence of intent to commit capital murder. *Id.* § 7.02(b) (West 2011); *Love v. State*, 199 S.W.3d 447, 452 (Tex. App.—Houston

14

[1st Dist.] 2006, pet. ref'd). Accordingly, the jury did not have to find that Turner personally intended Lam's death to convict him of capital murder.

Though the evidence at trial was somewhat conflicting, it was for the trier of fact to determine the credibility of the evidence and the weight to be given to it. *See Lancon*, 253 S.W.3d at 707. Here, the evidence that a rational trier of fact could have credited showed that Turner was acquainted with Brown and knew that he had a gun. Turner was present when Brown stated his intention to commit a robbery, yet he nevertheless went with Brown to Storekeepers twice that day, and he was with Brown when he inquired if a parked car was an unmarked police car. Turner admitted on his videorecorded statement to police that he was present when Brown robbed and shot Lam. The store's surveillance video showed a struggle between Lam and her assailant as she tried to lock the door from inside the store and was pulled outside before being shot. Two people—a police officer and a neighbor—watched Turner and Brown return to Northern Pines together. Both saw them enter Sheryl Mitchell's apartment, and one saw Turner go to his aunt's apartment shortly thereafter. Lam's purse was found in Turner's bedroom, and although Turner told police that Brown climbed through the window and stashed the purse there, a rational factfinder could have credited the eyewitness testimony that showed Brown returning to Northern Pines and going only to Mitchell's apartment before his arrest. Thus, a rational juror could have concluded that

15

Turner brought Lam's purse into his room. Other evidence was also found in Turner's room, including clothing matching the description of what he wore that night, a ski mask with Brown's DNA on it, and Lam's coin purse and social security card. In addition, because Lam's coin purse had evidence of Turner's DNA and not Brown's DNA, a rational finder of fact could conclude that only Turner, not Brown, handled it. Additional forensic evidence showed that there was gunshot residue on the pants found in Turner's room, which matched the description of what he wore that night. A rational trier of fact could have concluded, at the very least, that Turner was present and close enough to the shooter for that material to be present on those pants.

Turner's behavior after the event also supports an inference of his participation in the crime. He was extremely nervous at Mitchell's apartment, and he bathed and changed his clothes shortly after the shooting. *See Christensen v. State*, 240 S.W.3d 25, 31–32 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) ("The agreement to accomplish a common purpose, if any, must be made before or contemporaneous with the criminal event, but in determining whether one has participated in an offense, the court may examine the events occurring before, during, and after the commission of the offense.") (citing *Wygal v. State*, 555 S.W.2d 465, 469 (Tex. Crim. App. 1977)).

The evidence also supports an inference that the shooting occurred in furtherance of a plan to commit robbery. Turner told police that the first time he saw the gun that night was when Brown showed Lam the gun and demanded her purse. According to Turner, after several moments Brown shot Lam.

We conclude that the cumulative effect of the incriminating evidence of the events before, during, and after the commission of the offense would permit a rational trier of fact to have found beyond a reasonable doubt that Turner and Brown conspired to commit robbery, that the murder of Lam was in furtherance of that conspiracy, and that Turner should have anticipated Brown's actions. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We hold that the evidence is legally sufficient to support Turner's capital murder conviction. We overrule issue four, and we need not address issue five.

## II. Sentencing

In his first three issues, Turner challenges the sentence he received as unconstitutional and in violation of the Eighth Amendment's prohibition of cruel and unusual punishment. In his first issue, he argues that *Miller v. Alabama*, 132 S. Ct. 2455 (2012), applies retroactively to this case. *Miller* held that a mandatory sentence of life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on "cruel and unusual

punishments." *Id.* at 2460. Accordingly, in his second issue, Turner argues that his mandatory sentence of life without parole violated his Eighth Amendment rights because he was 15 years old at the time of the crime. Turner's third issue argues that even if the possibility of parole had been permitted under the statute applicable at the time of his sentencing hearing, a mandatory life sentence would still be unconstitutional. Turner thus argues that the sentencing statute is unconstitutional as applied to him and that this court cannot amend his sentence and render judgment that his sentence be life with the possibility of parole. The State concedes error on Turner's first two issues. Specifically, "[t]he State concedes *Miller* applies to Turner's case, and Turner should be resentenced." We agree that *Miller* is controlling and that the sentencing statute is unconstitutional as applied to Turner. We therefore sustain Turner's first two issues.

Both Turner and the State pray for remand for a new sentencing hearing. Accordingly, we remand this case for a new sentencing hearing in accordance with *Miller* and state law as recently revised in response to *Miller*. *See* Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 1, sec. 12.31, 2005 Tex. Gen. Laws 2705 (former version of Tex. Penal Code Ann. § 12.31), *amended by* Act of July 11, 2013, 83rd Leg. 2d C.S., ch. 2 (S.B. 2).

## Conclusion

We reverse the trial court's judgment as to punishment, and we remand for a new sentencing hearing.

Michael Massengale
Justice

Panel consists of Chief Justice Radack and Justices Sharp and Massengale.

Publish.   TEX. R. APP. P. 47.2(b).