**AFFIRM and Opinion Filed January 7, 2020**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00641-CR

### MONTOIA ANNA TAVARES, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 416th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 416-80928-2017**

## MEMORANDUM OPINION

Before Justices Whitehill, Schenck, and Richter[1]
Opinion by Justice Richter

Montoia Anna Tavares was charged with capital murder by causing the death of Miko

Walker during the course of committing or attempting to commit a robbery. A jury convicted her

of the lesser-included offense of murder and assessed punishment at fifteen years' imprisonment.

In two issues, appellant contends the evidence is insufficient to support her conviction. Concluding

appellant's arguments are without merit, we affirm the trial court's judgment.

## BACKGROUND

Shortly before midnight on February 3, 2017, Walker's neighbor, Donyell Burdette, heard

two gunshots, then a pause and additional gunshots. She looked out the window of her Plano

apartment and saw a woman and two men running away from the building. Although Burdette did

---

[1] The Hon. Martin Richter, Justice of the Court of Appeals for the Fifth District of Texas at Dallas, Retired, sitting by assignment.

not recognize the people she saw, police later identified two of them as appellant and Frederick Feaster. According to Burdette, the three people got into two cars and drove off like "they were just running from the situation that happened." She called the police.

The police arrived soon thereafter and were directed to an apartment on the second floor. The front door was open. Inside, they found Walker's body lying in his living room next to his handgun and a black cell phone. A television playing "jazz type" music had been knocked off the pedestal, indicating signs of a struggle. In the bedroom, the police discovered Walker's mattress on the floor. The drawer in the nightstand next to the bed was open. A partially smoked marijuana cigarette was lying on the bed, and a candle was burning on the dresser. In the bathroom, the police found a red cell phone and a drawer containing about $16,000 in cash. There were no signs of forced entry.

Shortly after the shooting, appellant and Feaster arrived at the emergency room of Methodist Dallas Medical Center in Richardson in a black car. Video showed another car pulling into a nearby parking lot just before appellant and Feaster arrived. After appellant and Feaster got out of the backseat and walked into the hospital, their car drove to the same parking lot where the previous car was waiting. Two minutes later, appellant walked out of the hospital and over to the other car in the parking lot.

Feaster remained in the hospital where ER nurse, Heather Cowan, noted he had gunshot wounds to his wrist, both his legs, and his left buttock. Cowan contacted police when Feaster told her he was in a fight at a bar and grill. Officer Hanks arrived and spoke to Feaster who told him he was shot while running away from a robbery at a gas station. Feaster claimed he called his "homeboy" and his "girl"—who he identified as "Toya Wright"—to take him to the hospital. In spite of Feaster's claim that his "girl" and "homeboy" were able to find the exact location where he was injured, the police could not locate the bar and grill or the gas station based on Feaster's

descriptions. Nor could they locate anyone by the name of Toya Wright. When hospital staff received a call from Plano police about Walker, Officer Hanks concluded Feaster was lying about being robbed. In light of these issues, police further questioned whether Feaster's gunshot wounds were consistent with his story of being shot while running away.

The police began investigating a possible motive for Walker's death. After speaking to multiple witnesses, police learned Walker was a drug dealer from Arkansas. It was Walker's "pattern" to travel to Plano with about $28,000 to $30,000 in cash to resupply his drugs. Because the police found only $16,000 in Walker's apartment, they suspected drug and robbery motives in Walker's death and Feaster's involvement.

Police obtained search warrants for the two cell phones found in Walker's apartment. They determined the red cell phone belonged to appellant, and the black cell phone belonged to Feaster. The phone records showed that hours before Walker's death, both phones were in Dallas until about 10:00 p.m. After 11:00 p.m., both phones showed they were in Plano near Walker's apartment. Based on this information, the police arrested Feaster and appellant.

At trial, appellant testified that she and Feaster had been dating for a few months. Appellant identified Feaster as a large-scale drug dealer who had been to prison many times. And though appellant never saw Feaster carry a gun outside his "trap house"—the place where a drug dealer sells drugs—appellant knew Feaster had a gun to protect his supply.

Appellant also testified that she and Walker had a previous dating relationship. Appellant met Walker while working as a dancer at a nude bar. Appellant knew Walker was a drug dealer who kept his gun "handy." Nonetheless, Walker was "very generous" and gave appellant large sums of money—often $1,000 or more—and bought her expensive things.

Appellant explained that she and Walker ended their relationship after having a falling out in December 2016. Over the course of three months, appellant's phone records showed that Walker

texted appellant on several occasions trying to reconnect with her, but appellant wanted nothing to do with him. The day before his death, Walker texted appellant and she responded that they "[would] never be cool." However, when Walker sent appellant a picture of a large stack of cash (in which Detective Pfahning testified was "almost identical" to the stack found in Walker's bathroom), appellant forwarded it to Feaster, leaving out any information identifying Walker as the sender. Walker and appellant proceeded to exchange 167 messages.

That night, Walker went to the club where appellant worked. When Walker asked appellant if she knew where he could buy drugs, appellant referred him to Feaster who sold drugs through the club. Walker and Feaster spoke that night and arranged to meet at Walker's apartment the following day.

The next day, Feaster asked appellant to go with him to Walker's apartment but she refused. According to appellant, Feaster threatened and choked her until she agreed. When they arrived at Walker's apartment, appellant called Walker to let him know they were there. Once inside, Feaster and Walker began talking in the living room. Appellant walked to the bathroom where she knew Walker hid his money. When she heard a "ruckus," she ran back into the living room where she saw Walker and Feaster arguing and "tussling." Appellant said Walker pulled out his gun and fired one or two shots. Appellant ran out the door and saw an unidentified male waiting downstairs. Appellant pushed him out of her way and continued running. Feaster followed her, grabbing her by her ponytail and demanding she get in his car. Because Feaster had been shot, they drove to the nearest hospital.

On cross-examination, the State pointed out inconsistences in appellant's version of events. Specifically, the State noted that at trial was the first time appellant admitted she went to Walker's apartment to facilitate a drug deal. In her initial interview with police, appellant told them she went to Walker's apartment to "chill," but he started acting crazy so she left. During that interview,

–4–

appellant claimed she called a cab using a stranger's cell phone and went home.

Moreover, on the night of Walker's death, appellant's phone records showed that she led Walker to believe that she alone was going to his apartment for an "intimate encounter." Text messages spanning from 9:16 p.m. to 10:57 p.m. read:

[Walker]: U cald cab yet . . . I shol wanated to rub on u

[Appellant]: I just called a cab . . . On the way

[Walker]: Hurry up cum on baby brng dat booty to dady

[Appellant]: Ok

After hearing all the evidence, the jury convicted appellant of murder and sentenced her to fifteen years' imprisonment.

## DISCUSSION

In two issues, appellant challenges the sufficiency of the evidence supporting her conviction. Specifically, appellant argues the evidence failed to show (1) she committed any act to cause Walker's death, and (2) she had any intent to commit murder. To support her arguments, appellant points to the fact that Feaster was undeniably the shooter. The State agrees the evidence established Feaster was the shooter, but also responds the evidence supports appellant's conviction as a co-conspirator or as a party to the murder. We agree with the State.

## Applicable Law

A person commits murder if he or she intentionally or knowingly causes the death of another or intends to cause serious bodily injury to another and commits an act clearly dangerous to human life which results in death. TEX. PENAL CODE § 19.02 (b)(1), (2). A person may also be guilty of murder as a co-conspirator if, in the attempt to carry out a conspiracy to commit one felony, murder is committed by one of the conspirators. TEX. PENAL CODE § 7.02(b). All

conspirators are guilty of murder, though having no intent to commit it,[2] if it was committed in furtherance of an unlawful purpose and was one that should have been anticipated as a result of carrying out the conspiracy. TEX. PENAL CODE § 7.02(b).

The law of parties provides that a person is criminally responsible for an offense committed by the conduct of another if he or she intentionally solicited, encouraged, directed, aided, or attempted to aid another with intent to promote or assist the commission of the offense. TEX. PENAL CODE § 7.02(a)(2). In determining whether the accused participated as a party, a jury may consider events occurring before, during, and after the commission of the offense. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012). Physical presence alone is insufficient to sustain a conviction as a party, but it may be considered as a factor in determining guilt. *Id*. Moreover, each fact need not point directly to the accused, "as long as the cumulative effect of the facts are sufficient to support the conviction." *Id*.

### Sufficiency of the Evidence

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011). We examine the evidence in the light most favorable to the verdict, and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Adames*, 353 S.W.3d at 860. The jury, as the factfinder, is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We defer to the

---

[2] The intent to participate in a conspiracy to commit an underlying felony supplies the mens rea for another felony actually committed in furtherance of the unlawful purpose. TEX. PENAL CODE § 7.02(b); *Turner v. State*, 414 S.W.3d 791, 797 (Tex. App.—Houston [1st Dist.] 2013) *aff'd as modified* 443 S.W.3d 128 (Tex. Crim. App. 2014). Thus, here, the State was not required to prove appellant had the intent to commit murder. Instead, it was required to prove she intended to commit a robbery. Because appellant does not challenge the underlying robbery on appeal, we need not address whether she had the intent to commit it.

jury's determinations of credibility, and may not substitute our judgment for that of the factfinder. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.). Therefore, we will conduct a single review of appellant's sufficiency complaints under the *Jackson* standard.

We measure the sufficiency of the evidence against the elements of the offense as defined by the hypothetically correct jury charge.[3] *Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex. Crim. App. 2018). A hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or . . . theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik v. State*, 953 S.W.2d 234, 238 (Tex. Crim. App. 1997). Furthermore, when the trial court's charge authorizes the jury to convict on more than one theory, the guilty verdict will be upheld if the evidence is sufficient on any one of the theories. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

The evidence showed that appellant and Walker had not spoken in months. It was not until Walker sent appellant a picture of a large stack of cash that she again became interested in him. In fact, over the span of two days, appellant and Walker proceeded to exchange 167 text messages, making Walker believe they were reigniting their sexual relationship despite appellant's relationship with Feaster.

Moreover, because appellant forwarded the picture of cash to Feaster, a rational jury could conclude she used Walker's interest in her to set up the robbery. Appellant connected Walker and Feaster at the club, and she went with Feaster to Walker's apartment to facilitate the drug deal. And though appellant claimed that Walker knew Feaster was with her when she went to Walker's

---

[3] In her opening brief to this Court, appellant argues the "court's charge does not specifically apply the party language to the application paragraph with any alleged act the appellant committed to be a party to the offense other than the act of shooting Miko Walker." To the extent the jury charge was erroneous, we nonetheless look to the hypothetically correct jury charge in a sufficiency review.

apartment, appellant's phone records otherwise showed that she made Walker believe that she alone was going to his apartment for an intimate encounter.

The jury heard conflicting evidence about the events that night, including whether appellant acted as a co-conspirator or as a party to Walker's murder. But as the sole judge of the witnesses' credibility, any conflicts in the testimony were within the province of the jury to resolve, and we must defer to those findings. *Brooks*, 323 S.W.3d at 899. Based on these facts, we conclude a rational jury could have found beyond a reasonable doubt that appellant acted either as a co-conspirator or as a party to Walker's murder. We affirm the trial court's judgment.

/Martin Richter//
MARTIN RICHTER
JUSTICE, ASSIGNED

Do Not Publish
TEX. R. APP. P. 47.2(b)

180641f.u05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MONTOIA ANNA TAVARES, Appellant

No. 05-18-00641-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 416th Judicial District Court, Collin County, Texas
Trial Court Cause No. 416-80928-2017.
Opinion delivered by Justice Richter.
Justices Whitehill and Schenck participating.

Based on this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 7th day of January, 2020.