**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00346-CR**

_____

**DELVIN AJAIR POWELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 199th District Court**
**Collin County, Texas**
**Trial Cause No. 199-80508-2019**

**MEMORANDUM OPINION**

A jury convicted Delvin Ajair Powell of capital murder, specifically murder for remuneration, and the trial court sentenced him to life in prison without the possibility of parole.[1] *See* Tex. Penal Code Ann. § 19.03(a)(3). In three issues, Powell challenges the sufficiency of the evidence to support the conviction and the

_____

[1] This case was transferred to this Court from the Fifth Court of Appeals in Dallas, Texas pursuant to a docket equalization order. *See* Tex. Gov't Code Ann. § 73.001.

1

trial court's denial of a motion to suppress evidence obtained after a search of his cell phone. We affirm the trial court's judgment.

## I. Background

Kayden Graham found her mother, Kelli Underwood, deceased in her home on the evening of September 20, 2017. The evidence established that Underwood was the victim of homicidal violence, suffering from multiple .22-caliber gunshot wounds and multiple stab wounds. The evidence further established that by the time Graham found her mother deceased, she had likely been dead for a few days, with the medical examiner placing her time of death in a window from the night of September 16 to the early morning hours of September 17, 2017.

### A. Testimony of Kayden Graham

Graham testified that at the time of her death, Underwood worked for Ronnie Welborn's company. According to Graham, Underwood and Welborn had also been engaged in a multi-year affair, despite him living with and recently having a child with Kadie Robinson. Welborn had keys to Underwood's home and truck. Graham testified that when police asked her who may have been involved in her mother's murder, Robinson entered her mind first, because of "how much hate that she had" for Underwood. Graham explained that not long before Underwood's death, Underwood and Robinson had a verbal confrontation in Underwood's front yard.

2

During Graham's testimony, the State questioned her about text messages between Robinson and Welborn admitted into evidence. Graham confirmed that on August 18, 2017, their messages referred to her mother. Specifically, Robinson told Welborn that "[y]ou are not going to get rid of her[,]" and Welborn assured her he would. Robinson then messaged Welborn and warned that he had a month, but if "it's not done by September 18th, I'm gone." Graham testified that she last spoke to her mother on September 15 and found her dead on September 20.

Graham also testified regarding messages between Welborn and Robinson on August 22, 2017, which said that Robert Veal "already took the money [and] he has the stuff[,] [h]e just has to place it in her truck[,] . . . then call in to police." Graham told the jury the messages also showed that Welborn and Robinson talked about contacting Veal and getting copies of keys made. The messages revealed that Robinson told Welborn she did not want to leave him, and Welborn responded "[t]hat's why I hope Robert can get it done." At one point in the messages, Welborn told Robinson that "Robert isn't going to do it." Robinson answered with "[t]ell him you want the money back and you better do the other like you said." Graham testified that these messages just confirmed her suspicions regarding Robinson's involvement in her mother's death.

Graham said her mother knew Robert Veal, because he previously worked at Welborn's shop. Before her death, Underwood hired Veal to install an above-ground

3

pool and new security cameras. Graham explained her mother tried to help Veal, who needed money.

Graham told the jury she never met Delvin Powell, but following the murder, she spoke to Underwood's neighbors to determine if anyone observed anything. One neighbor provided a name or a nickname, so she searched Facebook for the individual. After she pulled the Facebook profile, the neighbor, Ben, confirmed that was the person he mentioned. Graham provided the name to Texas Ranger Bruce Sherman.

Graham testified that when she arrived at her mother's home, the TV was paused on a music channel Underwood would not listen to. Graham also said there were several things out of place. Graham explained that her mother was "very OCD" about cleanliness, but she found unwashed dishes in the kitchen, along with soda cans, and cigarette butts in the backyard. Additionally, Underwood's security cameras and a monitor could not be located after the murder.

**B. Testimony of Texas Ranger Bruce Sherman**

Texas Ranger Bruce Sherman participated in the investigation of Underwood's murder. Sherman testified that upon arrival, they obtained a search warrant and conducted interviews. There were indicators it was a homicide because the initial responding officer observed .22-caliber bullet cartridges, which also told him they were looking for a .22-caliber firearm.

4

Sherman testified that Welborn had a volatile relationship with both Underwood and Robinson, each woman knew he was seeing the other. Sherman also testified that not long before her death, Underwood and Robinson had a verbal confrontation in the front yard of Underwood's home. Following this confrontation, Robinson pressured Welborn to "get rid of her[]" and threatened to leave if he refused. On August 18, 2017, according to Sherman, Robinson gave Welborn an ultimatum and deadline of one month.

Sherman explained that they initially planned to have illegal drugs planted in Underwood's truck, call in an anonymous tip, then have her arrested. To accomplish this, they reached out to a former employee of Welborn's, Robert Veal, who also knew Underwood. When it became clear that planting the drugs in Underwood's truck was not a viable option, Robinson and Welborn escalated the plan. Ranger Sherman testified that text messages between Welborn and Robinson discussed obtaining copies of Welborn's keys to Underwood's home. Sherman confirmed that cell phone records showed shortly after Robinson gave Welborn an ultimatum, she began contacting Veal. Robinson's cell phone records revealed an exponential increase in her communication with Veal after that date culminating with eighty-one contacts on September 16, 2017.

Sherman discussed Veal's August 26, 2017 Facebook message to Powell stating that "I have a job for you." Sherman testified while that contact in isolation

5

would not mean much, it was "pretty significant in that it appears that's the time period in which the plan to kill Ms. Underwood originated." Sherman also noted that the above-ground pool Underwood hired Veal to install was still in the box. Additionally, Underwood's security cameras and monitor were missing. Ranger Sherman testified that Facebook messages indicated Powell looked for a .22 pistol, beginning on August 30, 2017, and continuing until September 15, 2017.

Ranger Sherman testified that a woman by the name of Deborah Doris was also at Underwood's house while Powell and Veal were there, and although officers corroborated some information she provided, they could not corroborate other information. According to Sherman, Doris told law enforcement officers that she saw Veal hand Powell a gun in Underwood's home, which Powell put in a silver case. Law enforcement officers located a silver case in Powell's hotel room when they arrested him. Sherman testified that when they arrested Powell, they seized his cell phone and a knife. Additionally, law enforcement found a full box of .22-caliber Federal ammunition, the same brand and caliber used in Underwood's murder.

Ranger Sherman testified that while they acquired extensive information from cell phones, they also obtained a search warrant for Facebook records, which "was probably the primary source of communication for Mr. Powell[.]" Sherman testified that the individuals in this case were charged with murder for remuneration, and each of them separately and individually was a party to the offense.

6

## C. Testimony of Neighbor B. P.

Underwood's neighbor B.P. testified that he saw Powell, with whom he was acquainted, on Saturday morning September 16, 2017, when Powell came over to talk to him for about thirty minutes. Later the same day, he saw Powell entering and exiting Underwood's home. The neighbor provided Powell's nickname, "D" to Underwood's daughter, and when she brought over pictures, the neighbor identified him as the man he knew as "D." He testified that Powell told him he was "at a white lady's house chilling." The neighbor next saw Powell at Underwood's on September 20, which he remembered because later the same day, Underwood's daughter came out of the house "hysterical." He last saw Powell leave the home "with a guy and a woman carrying a baby carrier[.]"

## D. Forensic Evidence

Detective Arthur Jumper with the Collin County Sheriff's Office testified regarding the evidence collected at the scene. Jumper explained that they collected silverware, a camera monitor, a racing suit from the laundry room, cigarette butts from the backyard, and five .22-caliber shell casings from the crime scene. Jumper said they also collected buccal swabs from Robert Veal and Delvin Powell, Underwood's nail clippings, a knife with a missing tip that appeared to have blood on it, Underwood's Samsung Galaxy S7 cell phone, Powell's ZTE android cell phone, and Veal's Samsung Galaxy phone.

7

James Jeffress is a forensic scientist who works in the firearm tool mark section of the DPS crime lab. Jeffress testified that he concluded the shell casings were all fired from the same unknown firearm. He received a total of three firearms in this case, one pistol and two revolvers, all .22-caliber. Jeffress testified they eliminated all these firearms as having fired the bullets or cartridge cases submitted for analysis.

Clare Moyers, a forensic scientist in the DNA section of the Texas DPS Crime Lab, also testified. She explained that they pulled a DNA profile from a fork in the kitchen and compared it to a known sample from Powell; it was 467 septillion times more likely Powell contributed the DNA than some unknown individual. Moyers also testified that Powell was 357 septillion times more likely to be the contributor of DNA on a sample pulled from a Camel cigarette butt than an unknown individual. Another spoon swabbed at the scene was compared to a known DNA sample of Veal, who was found 1.21 quintillion times more likely to be the contributor than an unknown individual. Moyers testified DNA taken from Underwood's right-hand fingernail clippings were consistent with Powell's Y-STR profile; neither he nor anyone in his paternal line could be excluded as a contributor of the male DNA profile found under her fingernails. Moyers explained the selected Y-STR profile is found in 1,425 out of 5,717 total individuals in the database, but Veal was excluded as a contributor.

The forensic pathologist, Dr. Stephanie Burton, testified that she could not pinpoint an exact time of death but concluded that Underwood's death likely occurred late on September 16 or early September 17, 2017. Dr. Burton testified that Underwood suffered from five .22-caliber gunshot wounds and multiple stab wounds. Dr. Burton explained that the first two gunshot wounds could have been fatal, but all the gunshot wounds and stab wounds contributed to Underwood's death in the form of blood loss. Dr. Burton ultimately concluded that Underwood died of homicidal violence including gunshot wounds and sharp force trauma.

**E. Other Testimony**

An employee from Welborn's bank testified, and banking records admitted at trial showed, that on September 16, 2017, he withdrew $4,000.00 from his personal account. The bank employee explained that while it was not uncommon for Welborn to withdraw such a large sum, when he did so, it was usually from his business account. This time it was from his personal account.

Shawn Talley, a friend of Powell's, testified that Powell always carried a knife. Talley also told the jury that after the murder, he met Powell, and Powell gave him a Uniden video camera. Talley identified the camera as being like one shown on an empty box in Underwood's vehicle. Talley testified that Powell warned him not to hook the camera up online and that he may have to destroy it. Talley explained that shortly after Powell gave him the camera, Powell instructed him to destroy it,

9

which he did. Talley said on another occasion, Powell asked him to dispose of a bag. Talley testified that he was unaware of the bag's contents but did not take it with him, because there were police officers at the hotel where he met Powell. Powell became angry when Talley did not take the bag. Talley also testified that when he met Powell after the murder, Powell appeared to have money to spend, which was unusual.

**F. Cell Phone Records, Text Messages, and Facebook Records**

Beginning on August 30, 2017 and into early September, Powell's Facebook records established that he sought a .22-caliber weapon from multiple sources. One Facebook message Powell sent on September 4, 2017, stated that he was "hiding out trying to find a pistol to do a job then get paid[,]" which Ranger Sherman described as "[c]ertainly[]" important in the investigation into capital murder for remuneration. Facebook records revealed Powell and Veal discussed payment in the form of "grand," "ounces," or "onions," and Sherman explained "two onions" was a common reference to two ounces of methamphetamine. Facebook messages also showed Powell told an acquaintance on September 9, 2017, he was preparing to post an ad of "murder for hire[]" online. Facebook records and Sherman's testimony confirmed Powell messaged a friend that after he finished "this one job for 2500[,]" he would "be okay for a minute." Ranger Sherman testified that those messages supported the elements of capital murder for remuneration. Messages between

Powell and Veal established he would "crank the stereo up . . . go to work . . . [and] come out like nothing happened[,]" and Ranger Sherman testified that he believed this described "[h]ow they are going to kill Ms. Underwood."

Facebook records showed Powell messaged his girlfriend on September 16, 2017 and told her he was at "the mark's house[,]" which Ranger Sherman explained usually meant "target." Powell asked his girlfriend to "pray for me[,]" and reassured her that she would be paid if anything happened to him. Additionally, Veal's wife messaged Powell on Facebook and asked him not to let Veal do anything "stupid." Powell responded to her and assured her that if anything had to be done, he would do it instead of Veal.

## II. Procedural History

A grand jury indicted Powell for the offense of capital murder, specifically, murder for remuneration or the promise of remuneration from Robinson and Welborn. The indictment further alleged that Powell did so by shooting Underwood with a firearm, stabbing her with a knife, or stabbing her with a sharp object. The court's charge included an instruction on the law of parties. The jury found Powell guilty of capital murder as charged in the indictment. Powell timely appealed.

### A. Cell Phone Search Warrant

Law enforcement officers seized Powell's cell phone discovered in the hotel room where Powell stayed, which his girlfriend rented. Powell's girlfriend identified

the phone as Powell's, and after obtaining a warrant, law enforcement searched the phone. Ranger Sherman's probable cause affidavit supported the warrant. The warrant directed the specified device and its contents be searched and "to bring any evidence of the crime described in the warrant application" before the judge.

## B. Probable Cause Affidavit in Support of Warrant

In the probable cause affidavit, Ranger Sherman outlined his law enforcement experience and explained in his experience, how cell phones are typically used by criminals to communicate and store information of crimes. Specifically, he averred that he knew based on his training and experience

> individuals who possess evidence of a crime, to include murder, will utilize cellular and/or electronic devices to facilitate actions such as digital storage (video, audio, photographs), text communication via SMS, MMS and/or application based communication systems, social networking accounts and/or web based search engines used to communicate or research prior to/during/after the offense is committed. Cellular/personal electronic devices are commonly used by suspects of a crime to harbor and conceal evidence of a crime from the innocent public and law enforcement's awareness with remote storage capabilities using cloud and/or application based covert storage capabilities. I know from experience that cellular/personal electronic devices also have a geo-tag and coordinate capabilities that can provide time and location information of that specific device. Call log history, saved phone numbers and contact information with time/date stamps will often identify frequent associates and/or co-conspirators of a crime. Applications and/or notes containing passwords used for accessing cloud based storage that will contain digital audio, video and photograph evidence. Affiant knows that some forensic examiners and technology have the capabilities of recovering information from electronic devices which the user attempted to destroy, delete or erase from the device.

He further averred that Powell owned the phone, described the phone's make and model, listed the phone's serial number, and the phone's IMEI. Sherman explained law enforcement officials found the phone in Powell's girlfriend's hotel room "during a written consensual search . . . after Powell was arrested for outstanding felony warrants." Sherman further averred Powell was a suspect in a murder investigation. He described in detail the circumstances of Underwood's murder, the investigation, and Powell's suspected involvement. Specifically, Sherman outlined that Underwood's neighbors identified Powell being at the residence in the days leading up to the murder, and earlier in the day her body was discovered. Sherman averred that neighbors positively identified photos of Powell and Veal as being at Underwood's residence in a black Ford F-150 pickup truck and last left the home the morning of September 20, 2017 at approximately 10 a.m. with an unknown white female holding a baby carrier.

Sherman explained that officers had the victim's cellphone, which contained text communications with Veal, who Powell had been with at the scene, and outlined those communications. Sherman also explained in the affidavit that a sharp force object and a .22-caliber firearm were used in Underwood's murder. Ranger Sherman described evidence found in Powell's girlfriend's hotel room and vehicle following a consensual search that Powell's girlfriend identified as his, including a broken-

13

tipped knife identified as Powell's with an apparent blood stain,[2] and ammunition matching the caliber and brand used in Underwood's murder.

Finally, Sherman's affidavit provided information he received from Powell during an interview. Sherman stated Powell admitted being at the scene with Veal shortly before the murder, was caught lying several times about when he was last at Underwood's residence and confirmed "a blue racing suit" found in Underwood's dryer "belonged to Veal[,]" which was corroborated by evidence investigators found at the scene.

## C. Filing of Motions to Suppress

Prior to trial, Powell filed a Motion to Suppress Cell Phone Analysis and a Motion to Suppress Cell Phone Records and Analysis. In both motions, Powell complained that the probable cause affidavit supporting the warrant was inadequate, and the search violated: (1) the Fourth, Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution; (2) Texas Constitution Article I, section 9; (3) Texas Code of Criminal Procedure article 18.0215; and (4) Texas Code of Criminal Procedure article 38.23. The trial court conducted a hearing and denied both motions.

## III. Issues One and Two: Sufficiency of the Evidence

In his first two issues, Powell complains that the evidence is insufficient to support the jury's verdict convicting him of capital murder. He argues the evidence

---

[2] Subsequent presumptive tests for the presence of blood were negative.

is insufficient to show that he committed any act that caused Kelli Underwood's death and to establish that he did so for remuneration or the promise of remuneration.

## A. Standard of Review

In evaluating legal sufficiency of the evidence to prove the charged offense, we must review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, the reviewing court gives full deference to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. The jury may accept or reject all or part of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). "Our review of 'all of the evidence' includes evidence that was properly and improperly admitted." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas*, 517 S.W.3d at 766 (citation omitted).

15

## B. Analysis

A person commits murder "if he [] intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). A person commits capital murder if he commits murder as defined by Section 19.02.(b)(1) and "commits the murder for remuneration or the promise of remuneration[.]" *Id.* § 19.03(a)(3). Under the law of parties, a person is criminally responsible for an offense committed by another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" *Id.* § 7.02(a)(2). In determining whether one is a party to the offense, we look to events before, during, and after commission of the offense. *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012) (citation omitted).

The evidence established that Robinson and Welborn conspired to "get rid of" Underwood due to a volatile romantic entanglement between Welborn, Robinson, and Underwood. The evidence showed they enlisted Veal to help them do so, and shortly thereafter, Veal reached out to Powell about "a job," and Powell told people he would get paid. DNA evidence placed Powell inside the victim's home, and Y-STR analysis performed on Underwood's fingernail clippings could not exclude Powell as a possible source. Neighbors identified Powell as being in Underwood's home with Veal during the estimated time window of the murder. Neighbors also observed Powell leaving Underwood's home with a woman holding a baby carrier

16

early on the day Underwood's body was discovered, which was significant since Robinson recently had a baby.

The evidence showed that Underwood suffered multiple .22-caliber gunshot wounds fired from a single weapon and multiple sharp force stab wounds, all of which the coroner concluded contributed to her death. Facebook records established Powell sought a .22-caliber weapon from multiple sources shortly before the murder and stated he needed it for "a job." Powell's friend, Talley, testified he always saw Powell carry a knife. Law enforcement officers seized a full box of the same brand of .22-caliber ammunition as that used in the murder, from Powell's hotel room. One witness told investigating officers she saw Veal hand Powell a gun while in Underwood's house, which Powell put in a silver carrying case. Police later found a case matching that description in Powell's hotel room.

Powell told his girlfriend via Facebook message that he was at "the mark's house" and assured her she would receive payment if something happened to him. Talley also testified that after the murder, Powell had him destroy a Uniden security camera, which matched an empty box found in Underwood's truck, and shortly after the murder, Powell appeared to have money to spend, which was unusual.

"[R]emuneration is given a broad definition which . . . includes the idea of a reward given or received because of some act." *Rice v. State*, 805 S.W.2d 432, 434 (Tex. Crim. App. 1991) (citations omitted). A teller from Welborn's bank testified

17

that on September 16, 2017, Welborn made an unusually large withdrawal from his personal account. While Powell contends some cellphone records and social media messaging are open to interpretation, Ranger Sherman explained the slang Powell and Veal used referred to payment in drugs measured in ounces, as well as cash. The jury was free to disbelieve or believe this testimony. *Sharp*, 707 S.W.2d at 614.

Powell complains the evidence was insufficient to show he committed any act that caused Underwood's death. However, under a party theory, Powell is criminally responsible for the acts of others if, with intent to promote or assist in the murder, he "solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" Tex. Penal Code Ann. § 7.02(a)(2). He also challenges the credibility of certain witnesses and points to the "unsavory characters" who had access to Underwood. We defer to the jury's role to weigh the credibility of the witnesses and resolve conflicts in their testimony. *See Hooper*, 214 S.W.3d at 13.

We look to the events before, during, and after the commission of the offense. *See Gross*, 380 S.W.3d at 186. In doing so, we see that Welborn and Robinson conspired to "get rid of" Underwood and enlisted Veal to aid them. Veal, in turn, reached out to Powell to help with "a job[.]" Shortly thereafter, Powell sought out the same caliber of weapon used in Underwood's murder, mentioned putting an advertisement out for murder for hire, assured his girlfriend she would be paid money if anything happened to him, and told Veal's wife "[i]f it needs to be done[,]

18

I will do it." DNA evidence and eyewitnesses placed Powell at the scene with Veal during the time window of the victim's murder. Powell asked a friend to destroy property matching items taken from the victim's vehicle, and officers found a knife and the same brand and caliber of ammunition as used in the murder with Powell's belongings.

The cumulative force of the incriminating evidence is sufficient to support a capital murder conviction, specifically that Powell committed murder for remuneration. *See Balderas*, 517 S.W.3d at 766. The evidence was sufficient to support the capital murder conviction under a party theory. *See Turner v. State*, 414 S.W.3d 791, 797 (Tex. App.—Houston [1st Dist.] 2013), *aff'd as modified*, 443 S.W.3d 128 (Tex. Crim. App. 2014) ("The Court of Criminal Appeals has long held that the law of parties applies to capital murder.") (citations omitted). There was ample evidence from which the jury could reasonably infer Powell acted to kill Underwood either with a knife or firearm. We overrule issues one and two.

## IV. Issue Three: Motion to Suppress

In his third issue, Powell argues that the trial court erred by denying his Motion to Suppress Cell Phone Analysis. In support of this issue, Powell contends the search warrant affidavit failed to establish probable cause for the search of Powell's phone. We disagree.

## A. Standard of Review

We typically review a trial court's ruling on a motion to suppress under a bifurcated standard. *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013). However, a trial court's determination regarding the existence of probable cause to support a search warrant "is constrained to the four corners of the affidavit." *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011) (citation omitted). In reviewing a magistrate's decision to issue a warrant, "we apply a highly deferential standard of review because of the constitutional preference for searches conducted pursuant to a warrant over warrantless searches." *Bonds*, 403 S.W.3d at 873 (citing *Swearingen v. State*, 143 S.W.3d 808, 810–11 (Tex. Crim. App. 2004)). If the magistrate had a substantial basis for concluding probable cause existed, we uphold the magistrate's probable cause determination. *See id.*; *see also McLain*, 337 S.W.3d at 271. A magistrate should not use a hyper-technical approach and may draw reasonable inferences solely based on the facts and circumstances in the affidavit's four corners. *See Bonds*, 403 S.W.3d at 873. "When in doubt, the appellate court should defer to all reasonable inferences that the magistrate could have made." *McLain*, 337 S.W.3d at 272. In reviewing whether a warrant affidavit supports probable cause, we do not consider facts in isolation, rather we examine the affidavit from the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983); *Rodriguez v. State*, 232 S.W.3d 55, 59–60 (Tex. Crim. App. 2007).

**B. Analysis**

The Fourth Amendment of the U.S. Constitution and Article I, section 9 of the Texas Constitution protects citizens from unlawful searches and seizures. *See* U.S. CONST. amend IV; Tex. Const. art. I, § 9. While there are exceptions to the warrant requirement, there is a preference for searches conducted pursuant to a warrant executed on probable cause. *McLain*, 337 S.W.3d at 271. The affidavit's recited facts must be

> sufficient to support conclusions (1) that a specific offense was committed, (2) that the property or items to be searched for or seized constitute evidence of the offense or evidence that a particular person committed it, and (3) that the evidence sought is located at or within the thing to be searched.

*Sims v. State*, 526 S.W.3d 638, 644 (Tex. App.—Texarkana 2017), *aff'd* 569 S.W.3d 634 (Tex. Crim. App. 2019) (citation omitted); *see also* Tex. Code Crim. Proc. Ann. art. 18.01(c).

Sherman's affidavit recited that cellphones are commonly used in the commission of crimes, including murder. Sherman also averred those devices will commonly contain evidence of criminal activity such as text messages, web-based applications, and social media information. The affidavit stated that Powell was suspected of committing a murder, described Underwood's murder at her residence, noted Powell's confirmed presence at the residence with Veal, outlined Veal's text messages with the victim, described evidence seized from Powell consistent with

21

evidence found at the crime scene, and identified the cellphone to be searched with particularity and that it belonged to Powell.

In determining whether probable cause exists, magistrates may make reasonable inferences based on the allegations within the four corners of the affidavit and use a common-sense approach. *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010). Here, the affidavit noted how cellphones are frequently used in crimes, including murder, that Powell was suspected of committing murder, the facts that led to Powell being a suspect, and identified with particularity the cellphone belonging to Powell. It is reasonable to conclude, and the magistrate could have reasonably inferred from the four corners of the affidavit, a fair probability existed that evidence of the described crime would be found on Powell's cellphone. *See Sims*, 526 S.W.3d at 646 (citations omitted). Accordingly, the trial court did not err in denying the motion to suppress. We overrule Powell's third issue.

## V. Conclusion

Having determined that the evidence was sufficient to support Powell's capital murder conviction and that the trial court did not err in denying Powell's Motion to Suppress Cell Phone Analysis, we affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

22

Submitted on February 1, 2021
Opinion Delivered April 7, 2021
Do Not Publish

Before Golemon, C.J., Kreger, and Johnson, JJ.