**Opinion issued August 13, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

**NO. 01-22-00895-CR**

———————————

**GREGORY KENNITH WISE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 240th District Court**
**Fort Bend County, Texas**
**Trial Court Case No. 19-DCR-087757A**

---

## MEMORANDUM OPINION

A jury found appellant, Gregory Kennith Wise, guilty of the felony offense of murder[1] and assessed his punishment at confinement for life. In two issues, appellant contends that the evidence was legally insufficient to support his

---

[1] *See* TEX. PENAL CODE ANN. § 19.02(b), (c).

conviction and the trial court erred in denying his motion to testify free of impeachment by prior convictions.

We affirm.

## Background

Sharmil Simon testified that he previously worked at "Fast Food Saver," a convenience store owned by his uncle that was located on Texas Parkway. Simon described the convenience store as a "neighborhood store" and noted that it had "regular customers," which were mostly people who lived in the surrounding neighborhood. Simon could recognize the regular customers by their faces. In 2019, Simon worked at the convenience store seven days a week from 1:00 p.m. to 10:00 p.m. each day. Usually, during Simon's shift, there were no more than two or three people in the store at a time.

Simon also explained that the convenience store had surveillance cameras, both inside the store and outside the store. And there was a monitor by the front register that allowed Simon to view the videotaped recording from the surveillance cameras "live."

Simon further testified that he was working at the convenience store on June 7, 2019 when a "stabbing" occurred outside the store. He was inside the store at the time and saw the stabbing on the monitor for one of the store's outside

surveillance cameras. Simon also saw a man, the complainant,[2] collapse outside the store's front entrance. Simon then went outside to ask the complainant "what happened," but the complainant did not respond. Simon tried to wake up the complainant, but the complainant was unresponsive. Although Simon did not know the complainant's name, he recognized the complainant as one of the convenience store's regular customers, and according to Simon, he had never had "any problems" with the complainant. Simon also noted that the complainant came into the store on June 7, 2019, before the stabbing occurred, to buy a beer. The complainant then sat down outside the store's front entrance, which was not uncommon for the complainant to do.[3] Following the stabbing, other customers called for emergency assistance to help the complainant.

After law enforcement officers arrived, Simon showed the officers the videotaped recording from the convenience store's surveillance cameras. Officers viewed the videotaped recording from one of the surveillance cameras outside the store, which showed the complainant being stabbed. Law enforcement officers also viewed the videotaped recordings from the surveillance cameras inside the store, which showed the customers who had come into the store before the stabbing occurred that day. During Simon's testimony, the trial court admitted into

---

[2]     The record shows that the complainant's name was Brandon Yarbough.

[3]     Simon explained that the complainant would come to the convenience store almost every day and he would normally "hang out" in front of the store by himself.

3

evidence still photographs taken from the convenience store's surveillance cameras' videotaped recordings. Those photographs showed a man wearing a blue shirt with white shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, black shoes, and a backpack walking inside the convenience store. Simon explained that the man seen in the photographs was a regular customer, who came into the store almost every day.[4] The man usually wore a backpack, and he always wore shorts and a Dallas Cowboys baseball cap. On the day of the stabbing, the man came into the convenience store and bought a beer before the stabbing occurred.

Simon further testified that he continued working his shift at the convenience store after the stabbing. Later that same day, a law enforcement officer asked Simon to go to another location about two or three minutes away from the store. At the location, Simon saw the man who had been wearing the blue shirt with white shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, black shoes, and a backpack in the convenience store earlier that day. The man was wearing different clothes, but Simon recognized his face.

Simon signed a "Missouri City Police Department Field Identification Form," which was dated June 7, 2019.[5] By signing the form, Simon agreed that he

---

[4]     Simon noted that the man was not a "problem" customer.

[5]     A copy of the form was admitted into evidence at trial.

4

had "provided a detailed description of the subject[] involved in th[e] incident to arriving officer(s) prior to observing any subject(s) which ha[d] been detained as part of th[e] investigation" and he had "observed a subject[] detained by the Missouri City Police Department or another Law Enforcement Agency and positively identified the subject[] as being involved in the . . . incident." At trial, Simon identified appellant as the man who had been wearing a blue shirt with white shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, black shoes, and a backpack inside the convenience store on June 7, 2019.

Missouri City Police Department ("MCPD") Officer C. Castillo testified that on June 7, 2019, while on duty, he was dispatched in response to a call about a stabbing at the Fast Saver Food Store—a convenience store located at 1539 Texas Parkway, Fort Bend County, Texas. Upon arrival, Castillo saw the complainant lying on the ground outside the convenience store's front entrance. The complainant was lying face down on the store's front door mat and not moving. Castillo lifted the complainant's shirt and "saw blood and stab wounds on [the complainant's] back." Castillo checked to see if the complainant had a pulse and "tried to get him to respond," but the complainant was unresponsive. Castillo noted that he looked around the immediate area and did not see any weapons near the complainant. And the complainant did not have a weapon in his hand or within his reach. Emergency medical services personnel arrived soon after Castillo and

5

began attending to the complainant. The complainant was pronounced dead at the scene.

Office Castillo further testified that, while at the scene, he and other law enforcement officers viewed videotaped recordings from the convenience store's surveillance cameras, which showed the possible stabbing suspect—a man. Witnesses also noted that they had seen that man "go to the back of the neighborhood behind" the convenience store down Kenforest Drive after the stabbing. Castillo searched a portion of the area but did not locate the suspect or any weapon that had been used in the stabbing of the complainant. Castillo noted that other law enforcement officers searched the area as well and they did not find a weapon either.

MCPD Detective D. Spencer testified that on June 7, 2019, he was notified about a murder that occurred the Fast Saver Food Store, a convenience store on Texas Parkway in Fort Bend County. When Spencer arrived at the convenience store, the complainant's body was still there, but no suspects had been detained at the scene. Spencer and another law enforcement officer were then directed to notify certain family members of the complainant "about what had occurred." The complainant's sister lived close to the convenience store, and Spencer and the other law enforcement officer drove to the complainant's sister's home to notify her of the complainant's death.

6

After notifying the complainant's sister of the complainant's death, Detective Spencer and the other law enforcement officer began driving back to the convenience store, when they saw a man walking on Castle Creek Drive—a street near the convenience store. Spencer stopped and spoke to the man, later identified as Gerald Foot, because Spencer had received a photograph of the stabbing suspect from the convenience store's surveillance cameras' videotaped recording. Spencer thought Foot might know the suspect, and Spencer had reason to believe that the suspect taken had "gone down that direction." While speaking with Spencer, Foot seemed like he "would rather be some place else." Spencer showed Foot a picture of the man who had been wearing a blue shirt with white shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, black shoes, and a backpack inside the convenience store on the day of the stabbing, and Foot moved his head to gesture toward a group home in the neighborhood.

Because it did not appear that Foot was comfortable speaking with Detective Spencer on the street, Spencer went to Foot's home to speak with him further. At his home, Foot showed Spencer a photograph of a man punching a red punching bag. According to Spencer, the man in Foot's photograph was the same man who was in the convenience store on June 7, 2019 wearing a blue shirt with shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, black shoes, and a backpack. At trial, Spencer identified appellant as the man in Foot's photograph.

7

Detective Spencer further testified that later on June 7, 2019, he went to the group home in the neighborhood where Foot had directed him to go. After additional law enforcement officers arrived at the home, officers spoke with the home's owner, who consented to the officers entering the home. Appellant was found at the group home, but he was wearing different clothing; he was not wearing a blue shirt with white shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, black shoes, and a backpack.[6]

A search warrant was subsequently obtained to allow law enforcement officers to search appellant's bedroom in the group home. According to Detective Spencer, in appellant's bedroom, the clothing—a blue shirt with white shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, and black shoes, which had been seen on the man in the convenience store—was found.[7] A weapon or knife was not found.

---

[6] When shown a still photograph of the man in the convenience store's surveillance videotaped recording, members of the group home identified the man as appellant.

[7] The trial court admitted into evidence photographs taken of appellant's bedroom, which showed the clothing discovered by law enforcement officers—namely, a blue shirt with white shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, and black shoes.

Detective Spencer also explained that a "field identification"[8] was completed, and Simon, the employee from the convenience store, positively identified appellant.

As to the actual stabbing, Detective Spencer testified that the complainant was stabbed twelve times with a sharp object.[9] Spencer's investigation revealed that the complainant was stabbed while he was beside the convenience store. The side of the convenience store where the stabbing occurred faced Kenforest Drive— a street that ran into the surrounding neighborhood. Spencer also noted that the complainant's body was found at the front entrance of the convenience store. Spencer acknowledged that the complainant's body was not found at the same location where the stabbing took place. He explained, though, that the store's front entrance where the complainant's body was found was not far from the stabbing location.

During his testimony, Detective Spencer viewed a videotaped recording from the convenience store's outside surveillance camera. Spencer explained that

---

[8]     Detective Spencer noted that a field identification was typically done when "someone [was] detained in a relatively reasonable amount of time after a crime [was] committed." During the process, either a complainant or a witness is "brought [to] where the suspect or person of interest [is] detained," and the "person being detained is [then] removed from [a] patrol vehicle." The complainant or witness "looks at th[e] person from a few feet away to determine if [the person detained] is the correct person."

[9]     Detective Spencer testified that a knife or sharp object was a deadly weapon that was capable of causing serious bodily injury or death. A sharp object caused the complainant's death.

9

at about 3:35 p.m. on June 7, 2019, appellant can be seen on the videotaped recording "standing up against [a] brick wall on th[e] sidewalk" beside the convenience store. At about 3:42 p.m., the complainant walks past appellant; he does not stop and talk to appellant or say anything to appellant. The complainant does not appear to be agitated or confrontational with anyone around. Appellant then can be seen walking to a trash container before returning to his previously location and standing. At about 3:48 p.m., the complainant looks toward where appellant is standing and starts walking in appellant's direction. The complainant reaches into his waistband and pulls his pants up, and appellant at that same time runs toward him. Appellant stabs the complainant.[10]    Spencer noted, while watching the videotaped recording, that he did not see the complainant display a weapon, "pull out a weapon," or "[d]rop a weapon."[11]    At about 3:49 p.m., appellant starts running away. Although appellant's baseball cap flies off his head, he comes back to grab his cap. According to Spencer, shortly before the stabbing, appellant was inside the convenience store buying a drink, and he can be seen on the videotaped recording from the store's inside surveillance camera.

---

[10]    The trial court admitted into evidence still photographs taken from the videotaped recording from convenience store's outside surveillance camera. Detective Spencer testified that appellant can be seen with "a cutting instrument" or a sharp object in his hand in the photographs.

[11]    Detective Spencer noted that at the medical examiner's office, a screwdriver was found in the complainant's pocket.

10

Detective Spender also explained that he spoke with appellant on June 7, 2019. In appellant's statement to law enforcement officers, appellant said that he had gone to the convenience store on June 7, 2019, but he stated that he was there around 12:30 p.m. Appellant also said that he had been wearing the same clothes all day—different clothes than those seen on the man in the videotaped recording from the convenience store's surveillance cameras. Appellant also denied knowing the complainant. Appellant did not say that the complainant had threatened him or that he was afraid of the complainant. Appellant denied having an altercation or confrontation with anybody on June 7, 2019.

According to Detective Spencer, during his investigation, a person named Darrell Farley brought a videotaped recording to the MCPD. The videotaped recording was made on May 29, 2019, and it showed appellant and the complainant having a fistfight. It did not appear that any weapon or deadly force was being used at the time. Spencer stated that a couple of times in the videotaped recording, it looked like appellant was "running and lunging toward[]" the complainant.[12]

MCPD Officer B. Motto testified that on June 7, 2019, he was dispatched to the Fast Saver Food Store, a convenience store on Texas Parkway, because "a stabbing [had] occurred and the suspect had fled the location." At the scene, Motto

---

[12] The trial court admitted into evidence a copy of the videotaped recording from May 29, 2019.

was given a description of the suspect, which was a "Black ma[n] . . . with short hair, blue shirt with white shoulders, tan type fit shorts and black socks pulled up to his knees and white shoes." Motto then began searching the surrounding neighborhood for the suspect.

After Officer Motto was unsuccessful in his search, he returned to the convenience store. He then searched a trash container near the convenience store looking for a drink can, which he found. The drink can was collected as evidence.

Officer Motto further testified that he was later asked to go to a group home in the neighborhood near the convenience store. At the group home, he learned that appellant was the suspect that law enforcement officers had been looking for and that appellant was believed to be in or around the home. Motto went into the backyard of the group home and saw a white man and appellant talking. Motto confirmed appellant's name and handcuffed him.

MCPD Officer S. Lane testified that she was a crime scene investigator and on June 7, 2019, she was called out to a convenience store on Texas Parkway. After arriving at the scene, Lane observed a blood trail outside the convenience store. The blood trail went from the side of the convenience store to where the complainant was lying at the front entrance of the store.

Officer Lane further testified that, while at the scene, she took photographs of a trash container. According to Lane, the videotaped recording from the

convenience store's surveillance cameras showed the suspect buying a canned drink in the store, and officers searched the trash container near the store for the drink can. Lane noted that Officer Motto found the drink can in the trash container; she photographed it and collected it as evidence.

Later, Officer Lane went to a group home in the surrounding neighborhood to execute a search warrant. While searching appellant's bedroom in the group home, Lane found the same clothing that the suspect was wearing in the videotaped recording from the convenience store's surveillance cameras. Lane noted that the clothing was in the closet in appellant's bedroom. Lane also found a backpack in the closet that matched the one worn by the suspect at the convenience store. According to Lane, she found the Dallas Cowboys baseball cap in appellant's closet in a bin with a lid on top. The shoes were found in appellant's bedroom under a bed; they had a sheet or a blanket on top of them. Lane collected the clothing as evidence. Lane also noted that a red punching bag was discovered in the backyard of the group home, and she photographed it.

Kathleen McKinney testified that she was a section supervisor at the Texas Department of Public Safety Crime Laboratory in the "biology DNA section." Previously, she served as a "lead forensic scientist" at the crime lab in the "biology DNA section." As part of her job, she performed DNA analysis and comparison, and she performed DNA analysis on certain items related to appellant's case.

13

McKinney testified that she performed a DNA analysis on a pair of shorts that were taken from appellant's bedroom in the group home, and she determined that it was "93.2 octillion times more likely that the DNA that came from the shorts" belonged to appellant rather than an unknown person. McKinney also performed a DNA analysis on a swab taken from a "drink can" collected from the convenience store,[13] and she determined that it was "1,670 times more likely" that the DNA that came from the drink can belonged to appellant rather than an unknown person. McKinney noted that the probability number for the drink can was lower than the probability number for the shorts because she was not able to recover a full DNA profile from the swab taken from the drink can.

The trial court admitted into evidence a copy of the videotaped recording from one of the convenience store's outside surveillance cameras. The videotaped recording is dated June 7, 2019. At about 3:35 p.m., a person can be seen at the top of the screen either sitting or standing. At about 3:42 p.m., the complainant walks by the person who is sitting or standing and continues walking down the sidewalk next to a parking lot, getting closer and closer to the convenience store's outside surveillance camera's location. The complainant is holding a sheet of

---

[13]     Jacaranda Solis, a forensic scientist in the "biology DNA section" of the Texas Department of Public Safety Crime Laboratory who swabbed the drink can, testified that the drink can came from a trash container outside the convenience store and she swabbed the opening on the top of the drink can—"where [a person] would drink out of"—for potential DNA.

paper. At about 3:43 p.m., the complainant waves at someone who is off-camera and continues looking at the piece of paper in his hand. At about 3:44 p.m., another man hands the complainant a cigarette, and the complainant walks off-camera. About forty seconds later, the complainant walks back into the view of the surveillance camera and continues standing on the sidewalk beside the convenience store. He is still holding or looking at the piece of paper in his hand. At about 3:46 p.m., the person at the top of the screen walks toward a trash container and throws something away before returning to his original sitting or standing position. That person appears to be a man, and he is wearing a dark colored shirt with white shoulders, shorts, and dark shoes. The complainant remains in his same location next to the convenience store, holding and looking at the piece of paper in his hand. At about 3:48 p.m., the complainant appears to look toward the man at the top of the screen, and at 3:49 p.m., the complainant starts walking toward the man. The man then starts walking in the direction of the complainant. The man runs at the complainant, and they start fighting. The man, who is now closer to the outside surveillance camera's location, is wearing a blue shirt with white shoulders, shorts, a baseball cap, tall dark socks, and black shoes. During the altercation, the baseball cap that the man was wearing falls off his head and onto the ground. The man repeatedly stabs the complainant on the left side of the complainant's body and back with a sharp object. The man then runs away,

15

and the complainant walks in the opposite direction and goes off-camera. The man quickly returns to pick up his baseball cap; he also picks up a backpack before running off again away from the convenience store's outside surveillance camera. The complainant wanders back into view of the outside surveillance camera appearing to be holding the side of his body where he was stabbed.[14]

The trial court also admitted into evidence the videotaped recordings from the convenience store's inside surveillance cameras. Those videotaped recordings are dated June 7, 2019. At about 2:57 p.m., a man wearing a blue shirt with white shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, black shoes, and a backpack can be seen entering the convenience store. The man walks to the refrigerated section of the store and grabs a canned drink. The man then walks back down an aisle toward the store's register before paying the store employee for the canned drink at about 2:58 p.m. At 3:00 p.m., the man exits the convenience store. The videotaped recording shows the man's face at certain times while he is

---

[14] The videotaped recording from another one of the convenience store's outside surveillance cameras, which shows the front entrance to the convenience store, was also admitted into evidence. On that videotaped recording, at about 3:49 p.m., the complainant can be seen standing on the sidewalk along the side of the convenience store. He then walks out of the view of the outside surveillance camera. About thirty seconds later, the complainant stumbles back into the view of the outside surveillance camera and falls face down at the convenience store's front entrance. The complainant continues to lie on his stomach outside the convenience store's front entrance; he does not move and appears unresponsive. At about 3:57 p.m., a law enforcement officer arrives to the scene.

16

in the store. At about 3:49 p.m., the complainant can be seen falling outside the convenience store's front entrance.

Ami Murphy, a forensic pathologist, testified that she was a forensic pathologist and in June 2019, she was working at the Galveston County Medical Examiner's Office. Murphy performed an autopsy on the complainant's body on June 8, 2019.[15] The complainant had several sharp force injuries to his body, which would have been "caused by some type of sharp object to the body." The complainant had twelve sharp force injuries on his torso, left arm, and back. One of the two most significant injuries penetrated the complainant's abdominal cavity into the pelvic area and cut "the left common iliac artery," which Murphy explained was "a fairly large sized artery that c[ame] off of the aorta." This would have caused blood to pool inside the complainant's body. The other most significant injury was on the complainant's "left mid-back," and it went "into the [complainant's] left chest" and through "the lower lobe of [the complainant's] left lung." It then cut through the complainant's "pericardial sac, which [was] the sac that . . . [went] around the [complainant's] heart." This would have caused the complainant's heart to bleed internally. According to Murphy, the complainant

---

[15] A copy of Murphy's autopsy report and photographs of the complainant's autopsy were admitted into evidence at trial as well as a copy of the complainant's toxicology report. Murphy noted that the toxicology report showed that the complainant was positive for caffeine and "tetrahydrocannabinol which [was] an active ingredient in marijuana."

had about a liter of blood pooled inside of this body from his injuries. Because the complainant's blood pooled inside his body, rather than "spurting out," the person who stabbed the complainant may not have gotten blood on himself. Murphy opined that while the complainant was still conscious, he would have experienced pain.

Murphy further testified that the cause of the complainant's death was "sharp force injuries of the torso and left arm" and the manner of death was homicide. Murphy explained that during the autopsy certain personal belongings found on the complainant were collected. Among other items, the complainant had a small screwdriver, which was "about the same size as [a] dollar bill[]."

Appellant testified that he started living in a group home in Missouri City, Texas in 2018. Eleven people lived in the group home with appellant. Appellant noted that he went the convenience store on Texas Parkway on a regular basis. Appellant also stated that he knew the complainant, but he did not know the complainant's real name. Appellant called the complainant "Carrington," which was a nickname, and appellant did not think that the complainant minded.

Appellant further explained that, about two months before June 7, 2019, he met the complainant for the first time at a park. At the park, they talked for about thirty minutes about the civil rights movement. Appellant and the complainant would also smoke cigarettes together. According to appellant, when he first met

the complainant, the complainant "was a good friend"; "He was an ally." Appellant knew that the complainant lived in the same neighborhood as he did, but he did not know exactly where the complainant lived.

Appellant also testified that about a month before June 7, 2019, he and the complainant were at the convenience store on Texas Parkway. Appellant saw the complainant walking toward the store, and he struck up a conversation with the complainant. During the conversation, appellant received a telephone call about a callback for a job that he had applied to. Appellant stated that he "sort of gloated maybe a little too much," and the complainant got up and walked off while appellant was on the call. After appellant ended his telephone call, he followed the complainant and said to the complainant, "Yo, what's up, Bro? Do you want to smoke a cigarette with me, you know? Want to drink with me, you know, drink some soda." (Internal quotations omitted.) Appellant went to sit beside the complainant, and the complainant "randomly st[ood] up, like 'Get the F from beside me, Bro.'" When appellant asked what the complainant meant, the complainant "wail[ed] on [appellant] from the right side," meaning that the complainant punched appellant on the lip. Appellant then got up and asked, "Why did you hit me?" (Internal quotations omitted.) But this made the complainant "want[] to fight [him] even more." The complainant was "belligerent" and "charg[ed]" appellant. The complainant threw a beer bottle at appellant's feet.

19

The bottle did not hit appellant, but it scared him. Appellant then walked off and went back to the group home. Appellant noted that the complainant did not have a weapon with him that day. He also stated that he did not tell law enforcement officers about this incident when he spoke to them following his arrest in this case.

About a week later, appellant saw the complainant outside a store near the convenience store with "a mallet of some sort." According to appellant, he was walking to the convenience store with one of his friends from the group home when he saw the complainant about fifteen feet away from him with "a tool," "holding it up." Appellant did not want to talk to the complainant, but he did not feel threatened. And according to appellant, the complainant did not do anything threatening with the "mallet" that day. Appellant did not tell law enforcement officers about this incident when he spoke to them after his arrest.

Appellant further noted that about a week or two weeks before June 7 2019, he and the complainant got into a fight near his group home, which was filmed. Appellant stated that he was walking down the street when the complainant "cut[] off [his] . . . walking path." Appellant thought the complainant wanted to fight him, although the complainant did not say anything to that effect. Appellant and the complainant then engaged in "a slap boxing match." The fight ended with the complainant spitting in appellant's face. Appellant then walked off, and the complainant appeared to chase him down to fight again. Appellant got away.

According to appellant, the complainant did not have a weapon on him that day and appellant was not threatened with a weapon. Appellant noted that he wanted to fight the complainant, and he was angry that the complainant spat on him.

Additionally, appellant testified that about two weeks before June 7, 2019, he was standing outside in front of the group home and talking, when he saw the complainant walking across the street. The complainant "pull[ed] . . . up" a knife and then "drop[ped] it back in his trousers." Appellant also stated that he was not sure if the complainant had a knife, but "it was definitely a weapon." Appellant did not call law enforcement officers about the incident because the complainant was not acting in a threatening manner toward him. According to appellant, the complainant did not cross the street or come near him.

Appellant also testified that he believed that the complainant had taken his cellular telephone, but he did not confront the complainant about it. And appellant noted that there were times before June 7, 2019 when he did not feel that the complainant was a threat. There were times when the complainant and appellant would acknowledge each other or have a brief conversation without any problems. According to appellant, "[i]t[] [was] hard to say why [the complainant] would blow up like that."

As to the events of June 7, 2019, appellant testified that he planned to go to the library to study a math book and to finish his resume, and on the way to the

library, he stopped at the convenience store to "pick up some drinks." Appellant agreed that he had bought the canned drink that was found by law enforcement officers in the trash container outside the convenience store. According to appellant, he stayed around the convenience store to drink the beverage he bought because he was not allowed to bring it into the library. Appellant stood around listening to music and drinking. Appellant noted that even after he finished his drink and threw the canned drink away, he continued to hang out outside the convenience store.

Appellant further explained that the complainant showed up at the convenience store about ten or fifteen minutes after he had stepped outside the store to drink his beverage. Appellant gestured to the complainant to ask if he wanted to smoke a cigarette. At some point, the complainant came toward appellant going "full speed." Appellant then chose to go toward the complainant instead of running away. Appellant thought that the complainant "must have a gun on him or something," and "Navy Seal videos" taught him to "zig-zag toward[]" the person with a firearm. According to appellant, he had "a little baby knife" on him, which appellant described as a "straight knife." Appellant had the knife with him because he thought that "if anything [went] down," "it [would not] be . . . lethal."

22

Appellant stated that he first punched the complainant three times in his face, and then stabbed the complainant with the knife because the complainant was "be[ing] . . . bold." The complainant's boldness made appellant think that the complainant "must have a weapon on him of some sort." Appellant stabbed him "so many times" because the complainant did not run away so appellant thought the complainant might shoot him if he walked away. However, appellant also noted that he was holding onto the complainant as he stabbed him. Appellant ran away after he stabbed the complainant.

Additionally, appellant testified that no one else was involved in the altercation on June 7, 2019 other than himself and the complainant. And he stated that the complainant did not punch him on June 7, 2019. Further, appellant noted that the complainant initially walked by appellant and did not do anything to him, and the complainant did not threaten the complainant with a weapon. Instead, the complainant stood beside the convenience store and read a paper flyer. Appellant "chose to fight" the complainant; he could have left the convenience store. Appellant also admitted that he had never seen the complainant with a firearm before and he did not know if the complainant could afford one. Appellant "chose to protect [himself] with a knife," and he brought the knife with him when he went to the convenience store, which was the complainant's regular place to hang out.

23

According to appellant, he left the scene after the stabbing because he did not think that law enforcement officers "would believe [his] side of the story" and he was worried that someone else was "going to shoot somebody." Appellant stated that he went back to the group home, changed his clothes, and took a shower because he felt disgusted with himself. Appellant wrapped his clothes up in a bag and put them in his closet. As for the knife, he "put it in the gutter," but appellant could not recall where.

Appellant also testified that on June 7, 2019, he was scared that the complainant "was coming at [him] with a weapon" and he felt like he needed to defend himself with a knife. Further, appellant testified that before June 7, 2019, he was learning to box and there was a red punching bag in the backyard of the group home. According to appellant, he used the punching bag regularly and sparred regularly. Appellant denied previously pleading guilty to the offense of assault.

**Sufficiency of Evidence**

In his first issue, appellant argues the evidence is legally insufficient to support his conviction because "the evidence presented by the State failed to prove that [appellant] was the person in the surveillance video who killed [the complainant]," "none of the forensic evidence presented in th[e] case linked

[appellant] to the [complainant]," and appellant "was never identified by any of the [three] eyewitnesses present at the time of the assault."[16]

We review the legal sufficiency of the evidence by considering all of the evidence in the light most favorable to the jury's verdict to determine whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Our role is that of a due process safeguard, ensuring only the rationality of the trier of fact's finding of the elements of the offense beyond a reasonable doubt. *See Moreno v. State*, 755 S.W.2d 866, 867 (Tex. Crim. App. 1988). We defer to the responsibility of the fact finder to resolve conflicts fairly in testimony, weigh the evidence, and draw reasonable inferences from the facts. *Williams*, 235 S.W.3d at 750. That said, our duty requires us to "ensure that the evidence presented actually supports a conclusion that the defendant committed" the criminal offense of which he is accused. *Id.*

We note that in reviewing the sufficiency of the evidence, a court must consider both direct and circumstantial evidence and any reasonable inferences that

---

[16]     Appellant also frames his first issue in the context of the trial court erring in denying his motion for directed verdict. A challenge on appeal to the denial of a motion for directed verdict is a challenge to the legally sufficiency of the evidence. *See Gabriel v. State*, 290 S.W.3d 426, 435 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

may be drawn from the evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) (evidence-sufficiency standard of review same for both direct and circumstantial evidence). Circumstantial evidence is just as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *See Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). For evidence to be sufficient, the State need not disprove all reasonable alternative hypotheses that are inconsistent with a defendant's guilt. *See Wise*, 364 S.W.3d at 903; *Cantu v. State*, 395 S.W.3d 202, 207–08 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). Rather, a court considers only whether the inferences necessary to establish guilt are reasonable based on the cumulative force of all the evidence when considered in the light most favorable to the jury's verdict. *See Wise*, 364 S.W.3d at 903; *Hooper*, 214 S.W.3d at 13. The jury, as the judge of the facts and credibility of the witnesses, could choose to believe or not to believe the witnesses, or any portion of their testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Jenkins v. State*, 870 S.W.2d 626, 628 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b)(1). A person also commits the offense of murder if he intends to cause serious bodily

26

injury and commits an act clearly dangerous to human life that causes the death of an individual.[17] *See id.* § 19.02(b)(2). A person acts intentionally, or with intent, with respect to the result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b); *see also Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) ("Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the conduct, i.e., the causing of the death."). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46).

"Intent is almost always proven by circumstantial evidence." *Trevino v. State*, 228 S.W.3d 729, 736 (Tex. App.—Corpus Christi–Edinburg 2006, pet. ref'd); *see also Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) ("Direct

---

[17] Here, the indictment alleged that appellant committed the offense of murder under both theories, and the trial court instructed the jury accordingly. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2). In response to the trial court's charge, the jury returned a general verdict of guilty. When a trial court submits alternative theories of conviction to the jury, and the jury returns a general verdict, we will uphold the verdict if the evidence is sufficient to support any one of the alternative theories. *See Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005); *see also Hollins v. State*, Nos. 01-14-00744-CR, 01-14-000745-CR, 2015 WL 5076298, at *4 (Tex. App.—Houston [1st Dist.] Aug. 27, 2015, pet. ref'd) (mem. op., not designated for publication).

evidence of the requisite intent is not required . . . ."); *Smith v. State*, 56 S.W.3d 739, 745 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd). "A jury may infer intent from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime, and from the nature of wounds inflicted on the victim[]." *Trevino*, 228 S.W.3d at 736. A jury may also infer knowledge from such evidence. *See Stahle v. State*, 970 S.W.2d 682, 687 (Tex. App.—Dallas 1998, pet. ref'd); *Martinez v. State*, 833 S.W.2d 188, 196 (Tex. App.—Dallas 1992, pet. ref'd). In determining a defendant's guilt, a jury may consider events that occur before, during, and after the commission of an offense. *See Pitonyak v. State*, 253 S.W.3d 834, 844–45 (Tex. App.—Austin 2008, pet. ref'd); *Martin v. State*, 151 S.W.3d 236, 245 (Tex. App.—Texarkana 2004, pet. ref'd); *see also King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (jury may consider evidence showing consciousness of guilt).

The evidence presented at trial shows that the complainant's body was found lying outside the front entrance of a convenience store located on Texas Parkway in Fort Bend County. Simon, an employee of the convenience store, testified that he saw, through the monitor for the store's outside surveillance cameras, the complainant get stabbed before ultimately collapsing outside the store's front entrance. Simon went outside to check on the complainant, but the complainant was unresponsive. When Officer Castillo arrived at the scene, he found the

28

complainant's body lying on the ground face down outside the convenience store's front entrance; the complainant was not moving and unresponsive. Castillo lifted the complainant's shirt and "saw blood and stab wounds" on the complainant's body. The complainant was pronounced dead at the scene.

Detective Spencer, who investigated the stabbing, explained that the complainant was stabbed twelve times with a sharp object. According to Spencer, the stabbing occurred while the complainant was outside and next to the convenience store. While watching the videotaped recording from one of the convenience store's outside surveillance cameras, Spencer explained that the recording showed that at about 3:35 p.m. on June 7, 2019, appellant was "standing up against [a] brick wall on th[e] sidewalk" beside the convenience store. At about 3:42 p.m., the complainant walked past appellant; he did not stop and talk to appellant or appear to say anything to appellant. The complainant did not appear to be agitated or confrontational with anyone around. Appellant then walked to a trash container, which was also beside the convenience store, before returning to his previous location and resuming standing. At about 3:48 p.m., the complainant looked toward where appellant was standing and started walking in appellant's direction. The complainant reached into his waistband and pulled his pants up while appellant ran toward him. Appellant stabbed the complainant with "a cutting instrument" or a sharp object, which was in appellant's hand. At about 3:49 p.m.,

29

after stabbing the complainant, appellant started to run away from the scene, but returned to pick up his baseball cap which had flown off his head during the stabbing.

Additionally, the videotaped recording from one of the convenience store's outside surveillance cameras, which the trial court admitted into evidence, showed that at about 3:35 p.m., a person was either sitting or standing on the sidewalk beside the convenience store. At about 3:42 p.m., the complainant walked by the person who was sitting or standing and continued walking down the sidewalk, getting closer and closer to the outside surveillance camera's location. The complainant was holding a sheet of paper. At about 3:43 p.m., the complainant waved at someone who was off-camera and continued looking at the piece of paper in his hand. At about 3:44 p.m., another man handed the complainant a cigarette, and the complainant walked off-camera. About forty seconds later, the complainant walked back into the view of the surveillance camera and continued standing on the sidewalk holding or looking at the piece of paper in his hand. At about 3:46 p.m., the person at the top of the screen walked toward a trash container, which was along the side of the convenience store, and threw something away before returning to location where he was previously sitting or standing. The person in the videotaped recording was a man wearing a dark colored shirt with white shoulders, shorts, and dark shoes. While this occurred, the complainant

30

remained in his same location, holding and looking at the piece of paper in his hand. At about 3:48 p.m., the complainant appeared to look toward the man wearing a dark colored shirt with white shoulders, and at 3:49 p.m., the complainant started walking toward the man. The man also started walking in the direction of the complainant. The man then ran at the complainant, and they started to struggle. The man, who got closer to the convenience store's outside surveillance camera's location during the struggle, was wearing a blue shirt with white shoulders, shorts, tall dark socks, black shoes, and a baseball cap. His baseball cap fell off during the struggle. The man repeatedly stabbed the complainant on the left side of the complainant's body and back with a sharp object. The man then ran away, and the complainant walked in the opposite direction off-camera. The man quickly returned to pick up his baseball cap which was on the ground; he also picked up a backpack. The complainant wandered back into view of the outside surveillance camera appearing to be holding the side of his body where he was stabbed.[18] After picking up his baseball cap, the man ran away in the opposite direction as the complainant and the convenience store. *See Clay v.*

_____

[18]    The videotaped recording from another outside surveillance camera showing the front entrance to the convenience store was also admitted into evidence. On that videotaped recording, at about 3:49 p.m., the complainant can be seen standing on the sidewalk beside the convenience store. He then walks out of the view of the outside surveillance camera. About thirty seconds later, the complainant stumbles back into the view of the outside surveillance camera and falls face down outside the convenience store's front entrance. The complainant continues to lie on his stomach in front of the entrance door, not moving and not responding.

*State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) ("Evidence of flight evinces a consciousness of guilt."); *In re J.A.B.*, 440 S.W.3d 818, 823 (Tex. App.—El Paso 2013, no pet.) ("Evidence of flight is indicative of a consciousness of guilt[,] and it is a circumstance from which an inference of guilt may be drawn.").

Murphy, who performed the autopsy on the complainant's body, testified that the complainant had twelve sharp force injuries on his torso, left arm, and back which would have been "caused by some type of sharp object to the body." One of the two most significant injuries penetrated the complainant's abdominal cavity into the pelvic area and cut the complainant's "left common iliac artery," which Murphy explained was "a fairly large sized artery that c[ame] off of the aorta." That would have caused blood to pool inside the complainant's body. The other most significant injury was on the complainant's "left mid-back," and it went "into the [complainant's] left chest" and through "the lower lobe of [the complainant's] left lung." It then cut through the complainant's "pericardial sac, which [was] the sac that . . . [went] around the [complainant's] heart." That caused the complainant's heart to bleed internally. According to Murphy, the complainant had about a liter of blood pooled inside of his body from the sharp force injuries. While the complainant was still conscious, he would have experienced pain.

Murphy testified that the cause of the complainant's death was the sharp force injuries.

The evidence presented at trial supports a finding that someone intentionally or knowingly caused the death of the complainant or that someone intended to cause serious bodily injury to the complainant and committed an act clearly dangerous to human life that caused the death of the complainant.[19]  *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2); *see also Nisbett v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018) ("The defendant's culpable mental state may . . . be inferred from the extent of the [complainant's] injuries.").

Appellant first argues that the evidence is legally insufficient to show that *he* was the person who intentionally or knowingly caused the death of the complainant or the person who intended to cause serious bodily injury to the complainant and committed an act clearly dangerous to human life that caused the death of the complainant because no eyewitnesses testified that they saw appellant stab the complainant.  However, eyewitness testimony is not necessary to support a conviction for the offense of murder, and the lack of eyewitness testimony does not render the evidence in this case insufficient.  *See Nisbett*, 552 S.W.3d at 262, 268 (holding evidence sufficient to establish defendants committed offense of murder

---

[19]   The jury need not unanimously agree on the manner or the means of the commission of the complainant's murder.  *See Sanchez v. State*, 376 S.W.3d 767, 773–74 (Tex. Crim. App. 2012); *Ngo v. State*, 175 S.W.3d 738, 746 n.27 (Tex. Crim. App. 2005).

even though there were no eyewitnesses); *Gardner v. State*, 306 S.W.3d 274, 285–86 (Tex. Crim. App. 2009) (rejecting defendant's argument evidence was insufficient to prove beyond reasonable doubt that he was shooter because no eyewitness could affirmatively put him at scene); *Curry v. State*, No. 01-19-00942-CR, 2021 WL 2793473, at *3 (Tex. App.—Houston [1st Dist.] July 6, 2021, pet. ref'd) (mem. op.) ("[N]either eyewitness testimony nor DNA evidence is necessary to support a conviction for murder."); *Finley v. State*, 529 S.W.3d 198, 203–05 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (rejecting defendant's argument that no reasonable jury could have found him guilty of offense of murder because State "did not present any evidence from a witness who actually saw who killed [the complainant]"); *see also Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) ("[T]he lack of direct evidence is not dispositive of the issue of a defendant's guilt."). As previously noted, circumstantial evidence is just as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *See Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

Here, the videotaped recording from the one of the surveillance cameras outside the convenience store, which the trial court admitted into evidence, showed a man wearing a blue shirt with white shoulders, shorts, a baseball cap, tall dark socks, and black shoes stabbing the complainant. After stabbing the complainant

34

and before leaving the scene, the man picked up a backpack. Further, the videotaped recording from the surveillance cameras inside the convenience store, which the trial court also admitted into evidence, showed a man inside the convenience store wearing a blue shirt with white shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, black shoes, and a backpack buying a drink can before the stabbing occurred.[20]

After the stabbing, Foot, who was walking on a street near the convenience store, was shown a photograph of the man who had been wearing a blue shirt with white shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, black shoes, and a backpack inside the convenience store, and he directed Detective Spencer to a group home. Foot also provided Spencer with a photograph of the same man seen on the convenience store's surveillance cameras' videotaped recordings, and Spencer, at trial, identified appellant as the man in Foot's photograph.

---

[20]    Multiple law enforcement officers testified that they were able to recover the drink can from a trash container beside the convenience store, and the drink can was photographed and collected as evidence. McKinney performed a DNA analysis on a swab taken from the opening on the top of the drink can, and she determined that it was "1,670 times more likely" that "the DNA [on the drink can] came from" appellant rather than an unknown person. *See, e.g.*, *Allen v. State*, Nos. 05-11-00056-CR, 05-11-00057-CR, 2012 WL 2106530, at *2 (Tex. App.—Dallas June 12, 2012, pet. ref'd) (mem. op., not designated for publication) (State can prove identity through circumstantial evidence, including DNA).

Further, when law enforcement officers went to the group home after the stabbing, members of the group home identified appellant by name when being shown a still photograph from the convenience store's surveillance cameras' videotaped recordings. And both Detective Spencer and Officer Lane testified that a blue shirt with white shoulders, shorts, a Dallas Cowboys baseball cap, tall dark socks, and black shoes were found in the closet in appellant's bedroom in the group home and under appellant's bed; some of the items also appeared to have been hidden. *See Merlan v. State*, No. 05-15-00827-CR, 2016 WL 6462396, at *3 (Tex. App.—Dallas Oct. 31, 2016, no pet.) (mem. op., not designated for publication) (defendant's action in hiding bag containing firearm and ammunition indicated consciousness of guilt); *Sustaita v. State*, No. 14-09-00060-CR, 2010 WL 3418247, at *4 (Tex. App—Houston [14th Dist.] Aug. 31, 2010, pet. ref'd) (mem. op., not designated for publication) (holding defendant's flight from scene of purported suicide and hiding of firearm were consistent with finding of guilt); *Mendoza v. State*, No. 01-99-00622-CR, 2001 WL 278686, at *3 (Tex. App.—Houston [1st Dist.] Mar. 22, 2001, no pet.) (not designated for publication) ("The jury could have believed that hiding evidence indicated a consciousness of guilt.").

The trial court admitted into evidence photographs taken of appellant's bedroom in the group home which showed the clothing discovered by law enforcement officers. *See Turner v. State*, 414 S.W.3d 791, 798–99 (Tex. App.—

Houston [1st Dist.] 2013) (noting clothing matching description of what perpetrator wore while committing offense discovered in defendant's room), *aff'd as modified*, 443 S.W.3d 128 (Tex. Crim. App. 2014); *Brown v. State*, 212 S.W.3d 851, 865 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (explaining circumstantial evidence discovered in defendant's truck and motel room linked defendant to offense).

Further, McKinney testified that she performed a DNA analysis on the pair of shorts that were taken from appellant's bedroom, and she determined that it was "93.2 octillion times more likely that the DNA that came from the shorts" belonged to appellant rather than an unknown person. Circumstantial evidence that the defendant was the person who caused the complainant's death is sufficient to support a conviction for the offense of murder. *See Stone v. State*, 635 S.W.3d 763, 767 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) ("Identity may be proven through direct or circumstantial evidence, and through inferences."); *Monroy-Pena v. State*, No. 14-19-00129-CR, 2021 WL 786553, at *5 (Tex. App.—Houston [14th Dist.] Mar. 2, 2021, pet. ref'd) (mem. op., not designated for publication).

Appellant next argues that the evidence is legally insufficient to show that he was the person who intentionally or knowingly caused the death of the complainant or the person who intended to cause serious bodily injury to the

complainant and committed an act clearly dangerous to human life that caused the death of the complainant because there was a lack of "DNA evidence" to implicate appellant. But DNA evidence is not required to obtain a conviction for the offense of murder. *See Pena v. State*, 441 S.W.3d 635, 641–42 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ("The absence of DNA or fingerprint evidence at trial does not render the other evidence insufficient to support the conviction."); *see also Curry*, 2021 WL 2793473, at *3 ("[N]either eyewitness testimony nor DNA evidence is necessary to support a conviction for murder."). And a lack of physical or forensic evidence tying a defendant to a murder scene is only a factor for the jury to consider in weighing the evidence. *See Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006); *see also Sample v. State*, No. 05-19-01254-CR, 2021 WL 3042670, at *11–12 (Tex. App.—Dallas July 19, 2021, no pet.) (mem. op., not designated for publication) (holding evidence sufficient to support defendant's murder conviction despite fact that State offered no forensic evidence linking defendant to murder); *Cuellar v. State*, No. 08-18-00133-CR, 2021 WL 2184512, at *6–7 (Tex. App.—El Paso May 28, 2021, no pet.) (not designated for publication) (holding evidence sufficient to support capital murder conviction even though defendant argued no physical evidence connected him to murder scenes). Notably, "[t]he mere absence

of DNA . . . evidence does not affect the legal sufficiency of the evidence actually introduced at trial." *Pena*, 441 S.W.3d at 641–42.

Finally, appellant argues that the evidence is legally insufficient to show that he was the person who intentionally or knowingly caused the death of the complainant or the person who intended to cause serious bodily injury to the complainant and committed an act clearly dangerous to human life that caused the death of the complainant because the evidence does not "support the allegation that [appellant] was the person . . . in the surveillance video stabbing [the complainant]." Here, the jury viewed the videotaped recording from the one of the convenience store's outside surveillance cameras which showed the complainant being stabbed by a man in a blue shirt with white shoulders, shorts, a baseball cap, tall dark socks, black shoes, and a backpack. The jury also viewed the videotaped recordings from the convenience store's inside surveillance cameras which showed the same man inside the convenience store before the stabbing. The jury was then able to compare the man in the surveillance cameras' videotaped recordings to appellant in court. *See, e.g.*, *Harlan v. State*, No. 06-14-00236-CR, 2015 WL 5158457, at *5 (Tex. App.—Texarkana Sept. 3, 2015, pet. ref'd) (mem. op., not designated for publication) ("The jury was able to view the gunman from several angles from the convenience store's video surveillance recordings. . . . [T]he jury was able to visualize the gunman's build and mannerisms . . . and could compare

the gunman's build to [the defendant's build at trial].”); *Perales v. State*, No. 02-13-00458-CR, 2014 WL 3778275, at *2 (Tex. App.—Fort Worth July 31, 2014, no pet.) (mem. op., not designated for publication) (evidence sufficient to identify defendant as perpetrator where jury could compare videotaped recording from surveillance camera with defendant's in-court appearance to determine identity); *Harrison v. State*, No. 14-10-00254-CR, 2011 WL 5589532, at *12 (Tex. App.—Houston [14th Dist.] Nov. 17, 2011, no pet.) (mem. op., not designated for publication) (holding evidence sufficient to support jury's finding that defendant was perpetrator of offense where jury "viewed the video [of the offense] and the many still photos created from the video footage" and "jury was capable of making an assessment of the quality of the images and comparing the images to [defendant] at trial").

Viewing all of the evidence presented at trial in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant intentionally or knowingly caused the death of the complainant or appellant intended to cause serious bodily injury to the complainant and committed an act clearly dangerous to human life that caused the death of the complainant. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2). Accordingly, we hold that the evidence is legally sufficient to support appellant's conviction for the offense of murder.

We overrule appellant's first issue.

## Impeachment by Prior Conviction

In his second issue, appellant argues that the trial court erred in denying his motion to testify free of impeachment by prior convictions because appellant's "prior family violence conviction" "had no probative value in the present case and was highly prejudicial."

We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *Walker v. State*, 321 S.W.3d 18, 22 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd); *see also Moore v. State*, No. 01-18-00893-CR, 2020 WL 97175, at *4 (Tex. App.—Houston [1st Dist.] Jan. 9, 2020, pet. ref'd) (mem. op., not designated for publication) (noting appellate court reviews trial court's decision to admit impeachment evidence under Texas Rule of Evidence 609 for abuse of discretion). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). When considering a trial court's decision to admit evidence, we will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *Green v. State*, 934 S.W.2d 92, 102 (Tex. Crim. App. 1996) (internal quotations omitted). We will uphold a trial court's

evidentiary ruling if it is correct on any theory of law applicable to that ruling. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Evidence of a witness's prior conviction may be admitted for purposes of impeachment if the crime was a felony or a crime of moral turpitude, and the court determines that the probative value of admitting the evidence of the conviction outweighs its prejudicial effect. TEX. R. EVID. 609(a). The Texas Court of Criminal Appeals has set out a list of non-exclusive factors that courts should use to weigh the probative value of a conviction against its prejudicial effect. *See Theus v. State*, 845 S.W.2d 874, 880 (Tex. Crim. App. 1992). Such factors include: (1) the impeachment value of the prior crime, (2) the temporal proximity of the past crime relative to the charged offense and the witness's subsequent criminal history, (3) the similarity between the past crime and the charged offense, (4) the importance of the witness's testimony, and (5) the importance of the witness's credibility. *Id.*

Appellant, in his briefing, complains that the trial court "permitted the State to offer into evidence a prior family violence conviction wherein [it] stated that [appellant] bum-rushed [a] woman from behind." On direct examination, appellant's counsel asked appellant: "Back on May 7th of 2018, in the County Court of Waller County, were you convicted of assault in Cause No. CC18-300?" The following exchange then occurred:

| | |
|---|---|
| [Appellant:] | I'm not sure about the legal jargon. |
| [Appellant's counsel:] | But were you convicted of assault? |
| [Appellant:] | I honestly can't recall if I was convicted or if it was off the record. I'm not sure. Honest to God truth. |
| [Appellant's counsel:] | Okay. If I had a piece of paper that says you were convicted of assault, would it be lying? |
| [Appellant:] | If it's stamped by the State of Texas, I would believe you. |

Subsequently, on cross-examination, the State asked appellant:

| | |
|---|---|
| [State:] | The assault that your lawyer asked you about that you said you don't remember whether you're convicted of or not -- |
| [Appellant:] | Correct. |
| [State:] | -- that was actually something where you bum-rushed a woman from behind and assaulted her, right? |
| . . . . | |
| [Appellant:] | Absolutely, never ever in my life bum-rushed a woman from behind . . . my ex-girlfriend, which I never bruised her so bad she had to report it. I would never in my life bum-rush a woman. Ever. Wasn't raised to be that type of man. |
| [State:] | Okay. So you're denying that occurred? |

43

| | |
|---|---|
| [Appellant:] | Absolutely denying it. |
| [State:] | And you're denying that you stood up in a court of law and pled guilty to that? |
| [Appellant:] | To that, pleading guilty to that, yes, ma'am. I did not plead guilty to assaulting a woman, unless it was hidden somewhere in the fine print, which Waller County is known to do -- |

Here, we will presume, without deciding, that the trial court erred in admitting the complained-of evidence of appellant's prior conviction. But even if we were to make such a presumption, we must still perform a harm analysis to determine if the trial court's purported error requires reversal of the trial court's judgment. *See Petriciolet v. State*, 442 S.W.3d 643, 653–55 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (even if trial court improperly admitted evidence, appellate court must still determine whether defendant was harmed by erroneous admission).

The erroneous admission of evidence constitutes non-constitutional error. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Non-constitutional error requires reversal only if it affects the substantial rights of the defendant. *See* TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93–94 (Tex. Crim. App. 2011). A

defendant's substantial rights are affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury or had but a slight effect. *Barshaw*, 342 S.W.3d at 93–94.

We review the entire record to determine the effect or influence of the wrongfully admitted evidence on the jury's decision. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). In assessing the likelihood that the jury's decision was improperly influenced, we consider the testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Barshaw*, 342 S.W.3d at 94; *Motilla*, 78 S.W.3d at 355–56. The weight of evidence of the defendant's guilt is also relevant in conducting the harm analysis. *Neal v. State*, 256 S.W.3d 264, 285 (Tex. Crim. App. 2008); *see also Motilla*, 78 S.W.3d at 355–60. And we may consider closing statements and voir dire, jury instructions, the State's theory, any defensive theories, and whether the State emphasized the alleged error. *Motilla*, 78 S.W.3d at 355–56; *Hankins v. State*, 180 S.W.3d 177, 182 (Tex. App.—Austin 2005, pet. ref'd).

Appellant, in his briefing, fails to conduct a harm analysis under Texas Rule of Appellate Procedure 44.2(b) to show that he was harmed by the admission of the complained-of prior conviction evidence. *See, e.g.*, *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding defendant waived complaint on appeal because he inadequately briefed issue by failing to address whether alleged error was harmless); *Chaves v. State*, 630 S.W.3d 541, 556–58 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (holding defendant waived complaint trial court erred in admitting certain evidence because he "failed to adequately brief his assertion that he was harmed by the admission of" complained-of evidence); *Wilson v. State*, 473 S.W.3d 889, 900–01 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) ("Here, we do not address whether the trial court erred in admitting the complained-of . . . evidence because even were we to conclude that the trial court erred in admitting [the] evidence, appellant, in his brief, does not argue that he was harmed by its admission.").

To assert an issue on appeal, an appellant's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue by not providing supporting arguments, substantive analysis, and appropriate citations to authorities and to the record. *See id.*; *Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011); *Busby v.*

*State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008); *Chaves*, 630 S.W.3d at 555, 557–58. As the Texas Court of Criminal Appeals has emphasized, an appellate court has no obligation to construct and compose issues, facts, and arguments with appropriate citations to authorities and the record for the appellant. *See Wolfe v. State*, 509 S.W.3d 325, 342–43 (Tex. Crim. App. 2017); *Busby*, 253 S.W.3d at 673; *see also Wyatt v. State*, 23 S.W.3d 18, 23 n.5 (Tex. Crim. App. 2000) ("We will not make appellant's arguments for him . . . .").

In his briefing, appellant makes two general statements as to harm related to the prior conviction evidence about which he complains: (1) "The trial court's admission of the prior family violence charge . . . caused harm to [appellant]"; and (2) "The trial court erred by . . . admitting that conviction, causing great harm to [appellant]." But appellant's brief contains no argument, substantive analysis, or citation to authorities to show that he was harmed by the trial court's purported erroneous admission of the complained-of prior conviction evidence. *See Wyatt*, 23 S.W.3d at 23 n.5 ("We will not make appellant's arguments for him . . . ."); *see also Wilson v. State*, No. 01-22-00361-CR, 2024 WL 86505, at *7–11 (Tex. App.—Houston [1st Dist.] Jan. 9, 2024, pet. ref'd) (mem. op., not designated for publication) (although appellant argued that trial court erred in admitting certain testimony, holding complaint waived because appellant's brief contained no argument, substantive analysis, or citation to authorities to show that he was

47

harmed by purported erroneous admission of testimony). Accordingly, we hold that appellant waived, due to inadequate briefing, his complaint that the trial court erred in allowing evidence of his prior conviction to be admitted at trial. *See, e.g.*, *Cardenas*, 30 S.W.3d at 393 (holding issue inadequately briefed where "appellant d[id] not address the question of whether the alleged error . . . was harmless"); *Chaves*, 630 S.W.3d at 557–58; *Wilson*, 473 S.W.3d at 900–01.

## Conclusion

We affirm the judgment of the trial court.


Julie Countiss
Justice

Panel consists of Justices Landau, Countiss, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).